No. 82-459

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

BUNKE, INC., a Montana corporation,

Plaintiff and Appellant,

vs.

BOB JOHNSON and HARLAN CARPENTER, d/b/a
the JOCAR Partnership,

Defendants and Respondents.

---

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

James R. Carlson, Hysham, Montana

For Respondents·

Ralph L. Herriott, Billings, Montana

---

Submitted on briefs: March 24  1983

Decided: July 18, 1983

Filed: **JUL 1 8 1983**

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff Bunke, Inc. (Bunke) appeals from a decision of the Thirteenth Judicial District Court, Yellowstone County, in this declaratory judgment action arising out of the lease of The Rails Inn Motel in Forsyth, Montana. We affirm the District Court.

Bunke raises the following issues on appeal:

1. Does section 70-26-203, MCA, justify the tenant, Bunke, vacating the premises and discharge it from further payment of rent and other obligations under the lease?

2. Does the landlord's retaking of possession and operation of the motel terminate the lease and with it all of the obligations under the lease?

Plaintiff Bunke is a family corporation based in Miles City, Montana, which operates several motels in the area. Defendants Bob Johnson (a contractor) and Harlan Carpenter formed a partnership (Jocar) in fall of 1980 for the purpose of building the Rails Inn Motel in Forsyth, Montana. Their decision to build was based in part upon their ongoing negotiations with Burlington Northern Railroad (BN) for the use of the facility by a guaranteed number of BN employees, at that turn-around point on the line.

Letters from BN's Tom Jarnigan indicate that BN did not promise a long-range contract, but at first contemplated a guaranteed 35 rooms per day. The agreement finally entered into by Jocar and BN on March 31, 1981 guaranteed 20 occupancies per day at a reduced rate of $17 each. The contract was terminable upon thirty days' written notice or 24 hours' notice in the event of certain contingencies. No mention was made in the agreement of cafe or bar facilities. Bunke contends the restaurant and bar were essential to the BN lease, while Jocar's position is that those facilities

were to be installed if and when suitable operators could be found.

In spring of 1981, while Jocar was proceeding with the construction of the Rails Inn, Bunke expressed an interest in leasing and operating the facility. During subsequent negotiations between Bunke and Jocar, Garry Bunke, who is an officer of the corporation and an attorney, represented Bunke; Jocar was not represented by counsel. The record suggests that numerous matters were discussed which were not included in the lease agreement drafted by Garry Bunke and signed by the parties April 21, 1981.

The term of the lease was from May 1, 1981, to April 30, 1982. The monthly rental payment was $13,295, payable on the fifth day of the following month. The lease provided that Bunke would pay $11,400 or the actual property taxes, whichever was less, and $2,400 as its share of the insurance. Bunke would be liable for utilities, and would not involve Jocar in any expense or liability. Bunke had a one-year option to purchase the entire facility, including "the restaurant and bar portion," for $850,000; the price did not include "fixtures, furniture and equipment nor liquor license." In the event Bunke chose not to exercise the option to purchase, all lease payments were to be considered rental. Jocar had the right to terminate the lease upon 30 days' written notice for Bunke's failure to perform the conditions of the lease or failure to conduct its business properly.

The lease contained no provisions regarding:

a. The railroad occupancy agreement;

b. Installation and operation of a bar and cafe;

c. Responsibility for repairs and maintenance;

d. Responsibility for correcting flaws in construction and supplying furnishings;

3

e. Responsibility for complying with sanitary and licensing standards and getting a license.

f. The cost of signs;

g. Termination by Bunke;

h. Effect of termination upon the option to purchase and rental payments.

Bunke took possession of the Rails Inn on May 1, 1981, installed a manager, and opened for business May 4, 1981. In the weeks prior to Bunke's taking possession, Bunke's president, Paul Bunke, had visited the site numerous times. He was familiar with the progress of construction, and the fact that the Rails Inn was not completely finished at the time Bunke took possession, and could only enjoy limited occupancy at first. He also had read the BN agreement and was familiar with its terms.

Numerous problems arose between Bunke and Jocar from the outset, partly because the facility was newly constructed and was just starting up, partly because the lease failed to establish the responsibility of Jocar for certain equipment, adjustments and corrections demanded by Bunke.

Jocar did not finish the bar/cafe section; nor did Jocar find anyone to operate a bar/cafe during Bunke's occupancy, although the Rails Inn sign advertised "The Beanery Cafe" and "The Sidetrack Lounge." Jocar refused to finish and open the bar/cafe section unless a suitable operator could be found who was willing to pay the $3,000 or $4,000 monthly rental. Bunke claims many prospective clients turned away upon learning the facility lacked a bar and cafe. Bunke also claims the lack of a bar and cafe led to BN's reduction of its guaranteed occupancy from 20 to ten rooms per day, effective December 1981.

In the beginning of May when the Rails Inn opened, the bedspreads and color TV's had not yet arrived; the beds'

4

headboards did not match the mattresses; the parking lot was not paved; room key tags, checkout cards, and other small items were not provided; there was no ice machine; light fixtures in the restaurant portion and the basement were missing; security lights and door, certain handrails, electrical panels and fire extinguisher boxes were not finished. Loose bricks at the front entrance caused water to pool and seep into the lobby when it rained. In the weeks that followed, Bunke and Jocar could not agree as to which was responsible for finishing certain items, which items amounted to wear and tear, and how responsibility and expenses for signs, utilities and compliance with codes should be allocated.

During the summer of 1981, the Rails Inn was inspected by the Rosebud County Department of Public Health and the Montana Building Codes Divison. Certain deficiencies were found requiring correction before the Rails Inn could be licensed. These corrections included handrails on certain stairways, laundry chute sprinklers, laundry room fans, and basement sprinklers. Certain of the deficiencies were corrected by Jocar--the laundry chute was closed off and fans were relocated. Handrails were installed in October 1981. The last letter from the Rosebud County Department of Public Health is dated October 22, 1981. The letter indicated that further information was required from the Montana Building Codes Division before the motel could be licensed.

During the summer of 1981, Bunke and Jocar negotiated a substantial reduction of rental payments based upon the above deficiencies. They agreed to reduce the rent for May and June to 40% of actual income rather than the $13,295 monthly figure specified in the lease. The rent for May was $4,904; the rent for June was $8,760. Bunke and Jocar agreed that

5

the rental for July, August, and perhaps September, would be $12,500 per month.

Many deficiencies were actually corrected by Jocar. The parking lot was paved in July 1981; the TVs, proper headboards, and bedspreads were received and installed by mid-May. Jocar installed rain gutters, replaced bricks, and closed off the laundry chute to conform to building code requirements. Bunke supplied its own ice machine and repaired door locks. Certain matters remained unresolved, including the cost of signs and the absence of the bar/cafe.

On September 15, 1981, Paul Bunke sent Bob Johnson of Jocar the following letter:

> "This is to confirm our conversation at the Blue Spruce today, September 15, 1981. It is my understanding that the lease for the Rails Inn will remain at $12,500.00 for the month of September, less $1,886.03 for amounts due by JOCAR to Bunkes, Inc. It is further my understanding that the October rental is to be negotiated at that time. Further, and also pursuant to our conversation, we intend on setting November 1, 1981 as a termination date for the lease in exchange for releasing the option to purchase. We are willing to continue the lease if we can mutually agree with you as to terms for the month of November and subsequent months."

No reference is made to specific deficiencies or the overall incompleteness of the Rails Inn.

Jocar responded in writing on October 9, 1981, stating that full rental payments were expected. On October 16, 1981, Garry Bunke wrote to Jocar setting out a schedule of past payments. He mentioned the $4,904 May payment, which was only 40% of the gross income, "due to the fact that the motel was not completed on May 1." He also referred to the $8,760 June payment, also only 40% of the June gross, because "the motel still was not complete in many respects." Bunke stated that Jocar's failure to install the bar/cafe was the major problem with the lease. He stated that the motel was "still not complete in many respects," asserting that defects in the laundry room would have to be corrected before the

State would issue a license. On October 20, 1981, Jocar sent Bunke a letter which included a list of amounts due and stated:

> "Jocar will look to your corporation for the payments set forth in the written lease until the same expires of its own terms."

This intention was reiterated in a letter from Jocar to Bunke dated November 6, 1981.

On November 1, 1981, Bunke moved out of the Rails Inn. Bunke made no rental payments or other payments after October 1, 1981. Jocar operated the Rails Inn from November 1, 1981 to May 1, 1982, netting $36,758.83.

On November 25, 1981, Bunke filed its complaint, seeking a declaratory judgment that Jocar had breached the "terms and provisions, warranties and representations that they made to enter into the lease agreement," and seeking damages in the amount of $23,000 for that breach. Jocar cross-complained, alleging damages arising from Bunke's unilateral termination of the lease and its failure to make the remaining rental payments and other payments required by the lease agreement.

Trial was held on July 13-14, 1982, before the District Court sitting without a jury. On August 10, 1982, the District Court filed its findings and conclusions; judgment in favor of Jocar was entered August 24, 1982. The court held that Bunke was liable to Jocar for $54,572.98 plus costs; the amount represented adjusted damages less mitigation resulting from Jocar's operation of the Rails Inn between November 1, 1981 and May 1, 1982. Bunke appeals.

## I.

Bunke argues that the District Court ignored section 70-26-203(1), MCA, which states:

> "If within a reasonable time after notice to the lessor of dilapidations which he ought to repair, he neglects to do so, and if the cost of such repairs does not require an expenditure greater than 1 month's rent of the premises, the lessee may

7

perform such repairs himself and deduct the expenses of such repairs from the rent, or the lessee may vacate the premises, in which case he is discharged from further payment of rent or performance of other conditions." (Emphasis added).

Bunke cites cases in which this Court recognized that the lessor's failure to repair "dilapidations" justified the lessee's choosing either of the options stated in 70-26-203(1), MCA, and similar earlier code sections. Lowe v. Root (1975), 166 Mont. 150, 531 P.2d 674; Noe v. Cameron (1922), 62 Mont. 527, 205 P. 256.

The lessee's right to "repair and deduct" or vacate the premises if a lessor fails to make repairs he ought to make is well-settled in Montana. Lowe, supra; Lake v. Emigh (1946), 118 Mont. 325, 167 P.2d 575; §§42-401, 402, R.C.M. 1947; §§7741, 7742, R.C.M. 1935; section 70-26-203(1), MCA. This right arises under contract law and involves the presumption that a person would not agree to lease a residential facility which was unfit for human habitation. In Lowe, 166 Mont. at 159, 531 P.2d at 679, this Court recognized that the presumption extends to commercial residential facilities, such as hotels, stating:

"Beyond a doubt a hotel is 'a building intended for the occupation of human beings' and thus within the scope of sections 42-201 and 42-202, R.C.M. 1947."

It does not follow, however that a lessee may vacate without liability, or repair and deduct, where the needed repairs do not significantly affect the leasehold or compromise the purposes for which the property is leased. In Lake, 118 Mont. at 332, 167 P.2d at 579, this Court noted that sections 7741 and 7742 of the 1935 Revised Codes of Montana (forerunners to section 70-26-203, MCA) "relate only to dilapidations rendering the premises untenantable" or "unfit for habitation." Section 42-201, R.C.M. 1947, required that the lessor of a building intended for human occupation "must, in the absence of an agreement to the

8

contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof which render it untenantable . . . " Section 42-202 R.C.M. 1947, allowed a lessee to vacate, or repair and deduct up to one month's rent, as to dilapidations which the lessor "ought to repair."

Section 42-201, R.C.M. 1947, was repealed in 1977. Section 42-202 was reenacted substantially intact into section 70-26-203(1), MCA, applicable to commercial residential leases. The repeal of section 42-201 leaves in some doubt the character of those dilapidations which a landlord ought to repair under section 70-26-203, MCA. If the dilapidations must be so extensive as to render the premises untenantable, they would probably also be so extensive that the cost of repairing them would exceed a month's rent. This would leave the tenant with the unsatisfactory options of (1) remaining in premises, which while not untenantable are significantly affected by serious defects; (2) vacating at risk of liability under the lease; or (3) repairing at his own expense. On the other hand, the statute can hardly be intended to burden the landlord with making the most trivial repairs or facing a broken lease. Clearly, the dilapidations that a landlord ought to repair under section 70-26-203, MCA, are those which significantly diminish the enjoyment of the premises or substantially interfere with the purposes for which the lease premises are intended.

The record here establishes that the building "deficiencies" listed by Bunke were not such as to adversely affect rentals, thus compromising the purpose of the lease. Indeed, Bunke rented the rooms in the Rails Inn continuously from the first week of its possession of the facility. Bunke has not demonstrated that the deficiencies that existed were substantial enough to have an adverse financial effect.

9

Bunke relies upon Lowe, supra, to support its assertion that Jocar's failure to comply with all code requirements is sufficient to justify Bunke's abandonment of the Rails Inn in November, 1981. In Lowe, 166 Mont. at 159, 531 P.2d at 679, we stated:

> "[Lessee] had the choice of making the repairs called for by the letter of the fire marshal and deducting the cost from the rent payments, to the extent of one month's rent payment, or to vacate the premises."

In Lowe the deficiencies noted in the fire marshal's letter were sufficient to warrant the condemnation of the building as a fire hazard and a public nuisance.

In the case at bar the record supports the District Court's conclusion that Jocar took steps to remedy the deficiencies and bring the building up to code requirements so it could be licensed. Communications in the record from the Rosebud County sanitarian express the county's recognition of Jocar's correction of several problems. The remaining problems were obviously minimal; the record shows that Jocar obtained the city business license for the Rails Inn without difficulty. It appears that Jocar has not yet applied for a motel license from the State. During the summer months, the Rails Inn has been operating at about 83% of capacity, which Jocar considers successful.

This Court also must consider the negotiated agreement between Bunke and Jocar to reduce the May rent by $8,000 and the June rent by $4,500 because of deficiencies which existed when Bunke assumed occupancy of the Rails Inn. Such a substantial reduction in rent suggests that the parties settled the question between them, and that Bunke assumed the responsibility for correcting deficiencies. In effect, the negotiated reduction suggests an agreement to "deduct and repair." Section 70-26-203, MCA, is phrased in the disjunctive; a tenant is not granted the right to deduct for

10

the repairs of a building's flaws, and to vacate the premises because of the flaws.

The record also establishes that Bunke entered into the lease agreement and took possession of the Rails Inn knowing the facility was not finished, and that completion would take some time. Bunke may not fairly argue the delay in completion to justify a decision to abandon only a few months after taking possession.

In light of the evidence that (1) the deficiencies in the Rails Inn were not significant enough to have an adverse financial impact upon the motel's operation; (2) Jocar had taken some steps to conform to code requirements prior to Bunke's departure; (3) the rent reductions suggest an agreed settlement of Bunke's claims of incomplete construction, we find substantial evidence to support the District Court's conclusion that Bunke was not entitled to vacate without further obligation under the lease pursuant to section 70-26-203, MCA.

We note in passing that those "promises" which Bunke claims induced it to enter into the lease--the BN guaranteed occupancy agreement and the operation of a bar/cafe on the premises--are not dispositive here. First, and most obvious, they are not pertinent to the issues raised by Bunke. Section 70-26-203, MCA, is not applicable; the absence of a bar/cafe can hardly be considered a "dilapidation" which the landlord ought to repair. Second, if Bunke had intended to hold Jocar to any "promises", those promises could have and should have been incorporated into the lease agreement which Bunke's attorney drafted. This was not done. Where the contract is clear and unequivocal on its face, we will not consider parol evidence to modify its terms. Spraggins v. Elvidge (1981), ____ Mont. ____, 625 P.2d 1151, 38 St.Rep. 493. Evidence of negotiations which preceded the written

11

contract may have been admissible at trial to support Bunke's theory of fraud, under section 72-11-304(2), MCA. But the District Court found no fraud, and, as Bunke notes, fraud is not raised as an issue on appeal. Bunke may not use that evidence on appeal to seek to modify the terms of the contract, which is clear and unambiguous on its face, and which simply does not provide for Jocar's operation of a bar and cafe on the premises. Third, the record establishes that Bunkes had read and were familiar with the terms of the BN agreement. The agreement made no reference to a bar/cafe; it contained a 30-day termination provision. Bunke could not reasonably claim to have relied on assurances by Jocar that the bar/cafe was "necessary" to the BN agreement, or that the Rails Inn was certain to enjoy a long-term occupancy guarantee from BN. Finally, there is testimony from Bob Johnson that Jocar agreed to install a bar/cafe only if a suitable operator could be found, who could pay the monthly rental of $3,000-$4,000. Johnson testifed that he was unable to find such an operator, although a number of prospective operators were interviewed. There is substantial evidence to support the District Court's conclusion that Jocar was not obliged under the contract or otherwise to establish an operating bar/cafe within the Rails Inn.

We hold that Bunke was not entitled to vacate the Rails Inn under section 76-20-203, MCA, and that Bunke unilaterally breached the terms of the lease agreement by abandoning the premises on November 1, 1981, and failing to make the agreed monthly rental payments and other payments.

II.

Bunke argues that by reentering and taking possession of the Rails Inn on November 1, 1981, Jocar impliedly consented to Bunke's surrender of the premises, thereby extinguishing

Bunke's further obligations under the lease agreement. Bunke quotes from the American Law of Property subsection 3.99:

> "A lease may be terminated by surrender, a 'yielding up' to the owner of the reversion or remainder. The surrender ordinarily will not affect any interest third persons may have acquired in the leasehold. It extinguishes the lessee's liability for future rent, but not for accrued rent or for past breaches of other covenants.
>
> "The situation that has given rise to most litigation is that where the tenant abandons the premises and refuses to pay rent. The courts usually hold that the lessor may let the premises lie idle and collect the rent. There are statements in some cases that the lessor has a duty to mitigate damages, as for breach of contract, but most of the decisions are simply that if the lessor reenters for the purpose of reletting for the lessee he must use reasonable diligence in so doing. Generally, however, the courts hold that the lessor who reenters may relet for the lessee's benefit, holding the lessee for any deficiency, provided he gives the lessee notice." (Emphasis added)

Bunke also relies upon Knight v. OMI Corp. (1977), 174 Mont. 72, 568 P.2d 552. In Knight, the landlord cancelled the lease agreement for non-payment of rent. We found that the landlord's cancellation and reentry terminated the lease agreement, and absent an explicit saving clause in the lease agreement establishing the tenant's further obligations, there were none.

Bunke also refers this Court to Bonnet v. Seekins (1952), 126 Mont. 24, 29, 30, 243 P.2d 317, 320 (cited in Knight, supra), wherein this Court stated:

> "The obligation to pay the agreed rental continues until the lease is legally terminated. (citation omitted)
>
> "A lease for a fixed term may not be terminated by the act of the tenant in abandoning the property before the end of the term in the absence of consent on the part of the landlord. (citation omitted) The landlord's consent to the surrender or abandonment may be either express or implied. (citation omitted)
>
> "'A surrender cannot be effected by the act of only one party; the concurrence, in some way, of both lessor and lessee is necessary in order to

13

accomplish a surrender.' 3 Thompson on Real Property, p. 750, sec. 1491. 'The surrender of leased premises by the tenant before the expiration of the term is not effective unless there is an acceptance by the landlord. Any act equivalent to an agreement on the part of the tenant to abandon and the landlord to resume possession is sufficient to constitute surrender.' Id., p. 751." (Emphasis added)

We have no quarrel with Bunke's statement of the law, but we do not find it applicable here, where Jocar expressly rejected Bunke's surrender and refused to terminate the lease, but operated the Rails Inn for the purpose of mitigating damages.

In the case at bar, the lease agreement was not legally terminated by express consent, or by forfeiture or cancellation, as in Knight; in fact, Jocar expressly refused to consent to Bunke's vacating the Rails Inn. In three letters to Bunke dated both before and after November 1, 1981, Jocar warned Bunke that Bunke would be held to "strict compliance" with the terms of the lease agreement, and would be held liable for payments set forth in the lease agreement "until the same expires of its own terms." Jocar's position also was communicated to Bunke during personal meetings between the parties prior to Bunke's vacating the premises.

It is true that Jocar was present at the Rails Inn on November 1, 1981, to assist in inventorying certain motel furnishings for which Bunke was credited and that there was no particular acrimony between the parties at that time. Bunke relies upon this peaceable transfer to support its claim that Jocar impliedly consented to Bunke's departure. These facts are not dispositive. It is not necessary that parties come to blows or break off all dealings with each other to establish that their positions are legally irreconcilable. Jocar had made its position clear. Its presence the day of Bunke's abandonment of the premises was solely to facilitate the continued operation of the Rails Inn

14

for the purpose of mitigating the damages caused by Bunke's abandonment.

We hold, therefore, that where a tenant unilaterally terminates the lease of commercial residential premises and vacates, without justification under section 70-26-203, MCA, and the landlord expressly refuses its consent to the tenant's withdrawal, and subsequently operates the facility for the tenant in order to mitigate damages, the tenant is liable for the net damages. The District Court's findings to that effect are supported by the record and by the law.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice Frank B. Morrison, Jr., will file a written dissent later.

15