No. 88-130

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

EMPIRE DEVELOPMENT CO., d/b/a
BILLINGS NEON CO.,

        Plaintiff and Respondent,

   -vs-

BOB JOHNSON, d/b/a RAILS INN, and CLARA
E. IRONS, d/b/a BEANERY CAFE, SIDETRACK
LOUNGE,

        Defendants and Appellants.

———————————————

BOB JOHNSON, d/b/a RAILS INN,

        Counterclaimant and Appellant,

   -vs-

EMPIRE DEVELOPMENT CO., d/b/a
BILLINGS NEON CO.,

        Defendant and Cross-Appellant.

———————————————

APPEAL FROM:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Russell K. Fillner, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:
           Calton, Hamman, Calton & Wolff; Rodd A. Hamman,
           Billings, Montana

      For Respondent:
           West & Miller; Jock B. West, Billings, Montana

Submitted on Briefs:  Dec. 29, 1988
         Decided:  March 21, 1989

_____
              Clerk

Filed:
'89 MAR 21 AM 10 21
ED SMITH, CLERK
MONTANA SUPREME COURT

Mr. Justice William E. Hunt, Sr. delivered the Opinion of the Court.


Bob Johnson, doing business as Rails Inn, appeals from a judgment of the District Court of the Thirteenth Judicial District, Yellowstone County, awarding damages of $920 to Empire Development Company, doing business as Billings Neon Company (Billings Neon), for payments and deposit due under two sign rental agreements. Billings Neon cross-appeals from that part of the judgment relieving Johnson of liability for further payments under the leases. We affirm.

Johnson raises the following issue:

Did the District Court err by failing to credit Johnson for payments made under two lease agreements?

Billings Neon puts forth an additional issue for review:

Did the District Court err in concluding that Billings Neon failed to properly install and maintain rented signs as provided in the lease agreements?

On February 28, 1981, Bob Johnson, owner of the Rails Inn in Forsyth, entered into a contract with Billings Neon for the lease of one pylon display. The contract provided that, for a monthly rental of $565, Billings Neon would erect and maintain a pylon display consisting of a four-column structure on which a remote control clock and two "Rails Inn" signs were posted. The agreement also required Johnson to pay an advance deposit of $2,260.

On December 9, 1982, the parties negotiated a second lease, which expressly cancelled and superseded the first. The purpose of the second lease, apparently, was to remedy some visibility problems with pylon display. The second contract covered the existing pylon display and, in addition, required Billings Neon to erect and maintain a roof display

"Motel" sign. The lease called for monthly payments of $600 for 60 months, plus an advance deposit of $2,400. The parties agreed to transfer the $2,260 deposited under the first lease to the second, leaving a balance of $140 on the advance deposit. Johnson never paid the deposit balance.

On January 28, 1983, Johnson guaranteed a lease entered into between Billings Neon and Clara E. Irons. The contract required Irons, who leased the Beanery Cafe and Sidetrack Lounge from Johnson, to pay monthly rent of $260 for a "24 Hour Cafe" sign to be erected and maintained by Billings Neon. The contract also provided for an advance deposit of $1,040, which Irons paid.

The "Motel" and "24 Hour Cafe" signs were installed by approximately March 23, 1983. On July 20, 1983, a strong windstorm wrenched the motel sign off its supports, damaging the roof of the Rails Inn. Johnson's insurance paid for all but $100 of the repairs to the roof. Billings Neon did not compensate Johnson for the $100 although the contract required the sign company to carry insurance that indemnified against property damage claims.

The windstorm also damaged the cafe sign. One day after the gale, Billings Neon was notified of the damage to the signs. Billings Neon never repaired either sign, although it retrieved the motel sign and took it to Billings, where it was later destroyed.

Neither Irons nor Johnson made any monthly payments under the cafe sign contract. Johnson did not make any payments under the motel sign lease until January 19, 1984. At that time, Johnson paid $1,000 to Billings Neon. The Billings Neon bookkeeper testified that she did not credit this payment to the motel sign lease, but instead applied the payment to the month of October 1982 and part of November 1982 under the first lease. On June 25, 1984, Johnson paid

$1,500 to Billings Neon. The bookkeeper applied part of that payment to the first contract and the rest to other accounts Johnson kept with Billings Neon.

On December 5, 1984, Billings Neon notified Johnson in writing that he was in default on the motel sign lease, giving him five days to pay the balance due. Johnson failed to make the payment requested. Therefore, on December 12, 1984, Billings Neon accelerated the contract, demanding payment of $33,740. Johnson did not pay.

Both the first and second Rails Inn leases provided for a remote control clock on the pylon display. Johnson testified that he understood that the remote control box was to be installed in the motel office. His employees, however, could not locate the box, which caused a great deal of inconvenience during Forsyth's frequent power outages.

Apparently, at some point between July 1983 and April 1985, the pylon display quit working. In April 1985, the new manager of the Rails Inn contacted Billings Neon to inquire about repairing the display. The manager was told that if he paid some money, the sign might be fixed. The manager sent a $600 payment in response. A few days later, a local electrician appeared and began to work on the display. When the motel manager discovered that the electrician thought he was working for the motel, not Billings Neon, the manager informed him that Rails Inn would not be responsible for the bill. The electrician left.

The pylon display stood unrepaired until, some time later, Johnson hired his own electrician to work on it. This electrician discovered that the control box for the remote control clock was located on one of the display poles approximately 10 or 12 feet from the ground. He was unable to repair the controls.

On October 18, 1985, Billings Neon filed a complaint against Bob Johnson, alleging breach of the second lease and claiming damages of $33,740. Billings Neon also sought damages for breach of the cafe sign lease from either Clara Irons, as primary beneficiary of that agreement, or Johnson, as guarantor. Irons, however, had filed a petition for bankruptcy on June 10, 1983, which barred any action against her.

In response to the complaint, Johnson filed a counterclaim against Billings Neon, alleging breach of the first and second leases for failure to properly construct and maintain the signs and seeking a refund of all monies paid under the leases. Johnson additionally sought $129.50 in bills incurred by Billings Neon employees at the Rails Inn. At trial, Billings Neon admitted that it had authorized these bills. Thus, the charges are not at issue in this appeal.

After a one-day bench trial on April 22, 1987, the District Court found that Billings Neon failed to properly install and maintain the signs under the two Johnson leases and to maintain the sign under the Irons lease. The court concluded that Johnson was not liable for any rentals due under the leases subsequent to such failures. The court found, however, that Johnson was liable for the months of April, May and June 1983, under the Irons' lease, for a total of $780. It also found that Johnson was liable for the $140 advance deposit he failed to pay under the second lease. In addition, the court awarded Johnson $129.50, representing the room and meal charges incurred by the Billings Neon employees. The court refused to grant either party attorney fees. From this judgment, both parties appeal.

Johnson argues that the District Court erred by failing to credit him for rental payments made under the first and second lease agreements. At the same time we consider

Johnson's argument, we must examine the question raised on cross-appeal, that is, whether the District Court erred in ruling that "Billings Neon failed to perform its obligation to properly install and maintain the signs under the two Johnson leases and failed to maintain and repair the sign installed under the Irons lease . . ."

The facts demonstrate that the first lease was cancelled and superseded by the second. By mutually cancelling the initial agreement and substituting a new one in its place without expressly reserving their rights, the parties extinguished any claims they may have accumulated against each other under the first contract. Harrison Western Corp. v. United States (9th Cir. 1986), 792 F.2d 1391, 1393. Johnson therefore abandoned all claims for rental credit under the initial lease by failing to reserve his rights when he entered into the second.

The cancellation of the first lease precluded the District Court from considering whether either party had breached that agreement. Therefore, the District Court erred in finding that Billings Neon breached the first agreement. This error, however, did no harm to Billings Neon because the District Court failed to award Johnson any damages due to the alleged breach.

The trial court found that Billings Neon breached that part of the second Johnson agreement pertaining to the installation of a remote control for the pylon display clock. Billings Neon argues that this finding was in error, contending that a "remote control setting clock" as specified in the contract referred to a clock that could be reset by a means other than manually changing its hands. From this argument it follows that the installation of a remote control box at any spot away from the face of the clock adequately fulfilled the contractual term and Billings Neon complied

with the agreement by installing the controls approximately 10 feet off the ground on one of the display pillars.

Both the first and second Johnson lease agreements specified that the pylon display would include a remote control setting clock. In the second contract, the directions for the installation of the clock stated only, "Remain as installed."

A district court must interpret a contract in a manner that gives effect to the intent of the parties at the time of the execution of the contract. Section 28-3-301, MCA. The court must ascertain the parties' intent from the language used in the writing. Section 28-3-303, MCA. When the language of the contract is unambiguous, as it is in the second lease agreement, a resort to parol evidence is unnecessary. Bunke, Inc. v. Johnson (1983), 205 Mont. 125, 137, 666 P.2d 1234, 1240. According to the plain language of the contract, at the time the parties executed the second lease, they had no quarrel with the location of the remote controls for the pylon display clock. The District Court therefore erred in allowing Johnson's testimony that he understood that the controls for the clock would be installed in the motel office. Billings Neon complied with the terms of the second lease by leaving the remote controls in the pylon display where they were originally installed.

Billings Neon next contends that the District Court erred in finding that it breached the second Johnson lease and the Irons lease by failing to repair the motel and cafe signs after the July 20, 1983 windstorm. Billings Neon argues that the failure of either Johnson or Irons to make monthly payments under these leases relieved it of the obligation to repair the signs.

"The non-payment of an installment of money when due will always create a right of action for that money, but it

will not always be a total breach. A partial breach by one party . . . does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages." 4 Corbin on Contracts § 946 (1951). Whether the default of an installment payment constitutes a total breach thereby relieving the non-breaching party of its obligation to perform depends on the facts of each case. Gramm v. Insurance Unlimited (1963), 141 Mont. 456, 461, 378 P.2d 662, 664.

In the present case, both Johnson and Irons failed to remit the monthly rent on their respective leases as the payments came due. Both leases provided that, in the event of default in payment by the lessees, Billings Neon could, at its option and with notice to the lessees, call the entire balance due. Although the leases were in default as of April 1983, Billings Neon failed to exercise the acceleration option until December 12, 1984, over one and one-half years later. In the meantime, the cafe and motel signs were each damaged by the July 20, 1983, windstorm. Billings Neon failed to repair either sign, even though it had actual knowledge of the damage.

The acceleration clause gave Billings Neon the ability to treat the lessees' failure to pay as a total breach. Billings Neon, however, failed to exercise that option until December 12, 1984. Therefore, prior to the exercise of the acceleration option, Billings Neon treated the non-payment of installments as a partial breach. Hence, as of July 20, 1983, the date on which the signs were damaged, Billing Neon was not excused from performing under the contracts. By failing to comply with the contractual duty to maintain the signs, Billings Neon breached the agreements.

Consequently, as of July 1983, both parties were in breach--Johnson for failing to pay rent, Billings Neon for

failing to repair. Accordingly, each was entitled to damages. Under the contracts, Johnson's remedy for Billings Neon's breach was a credit on all rentals due after July 1983. Thus, by failing to repair the signs, Billings Neon limited its damages to the three months the motel and cafe signs were in operable condition.

The District Court found Johnson liable, as guarantor of the Irons lease, for three months rent. Johnson does not contest this finding. He does, however, take issue with the District Court's computation of damages under the second motel sign lease. Johnson contends that he should be liable at most for the three months the motel sign stood atop the Rails Inns. If his liability is calculated in this manner, the damages suffered by Billings Neon equaled only $1,800--three months rent at $600 per month. However, Johnson paid Billings Neon $3,100--$1,300 more than $1,800. Johnson argues that the District Court erred by failing to give him credit for the excess amount. We do not agree.

The record reflects that Billings Neon applied $600 of the total $3,100 paid by Johnson to the second sign contract and split the remaining $2,500 between the first sign lease and other accounts Johnson retained with the company. Clearly, Billings Neon erred by applying any of the payments remitted by Johnson after the execution of the second contract to the first lease. As we have stated previously in this Opinion, the failure of the parties to expressly reserve their rights when cancelling the initial contract extinguished all claims either party had under that contract. Billings Neon abandoned any right to payments it may have had under the first lease when it signed the second.

We do not hold, however, that the District Court erred by failing to credit Johnson with any monies paid over and above the $1,800 due under the second lease. The record

reflects that Johnson kept other accounts with Billings Neon. The checks paid by Johnson do not indicate to which account the payments were directed. When a debtor who owes several obligations to a creditor fails to manifest an intent that he wishes payment to be applied to a particular account, the creditor may apply it to the account of the creditor's choosing. Section 28-1-1106(d), MCA. Since Johnson did not indicate which account he was paying when he remitted the checks, Billings Neon acted fully within its rights by applying the checks to other service accounts Johnson held with the company.

Johnson also argues that the District Court erred by failing to credit him with the $100 he paid as deductible on his insurance when the windstorm tore the motel sign off its supports and damaged the Rails Inn roof. Under the lease, Billings Neon agreed to carry insurance to indemnify Johnson against claims for damages to property caused by the signs. The evidence demonstrated, however, that the severity of the storm caused the damage to the roof, not any failure on the part of Billings Neon to properly erect the sign. Therefore, the District Court did not err by failing to credit Johnson with the $100 deductible.

Lastly, Billings Neon maintains that it prevailed in the action because it was awarded a net judgment by the District Court. As the prevailing party, Billings Neon argues, it should have been awarded a reasonable attorney fee as provided by the contract.

Generally, the party who receives the net judgment in an action involving a counterclaim will be considered the prevailing party for purposes of an award of attorney fees. However, this is not always the case. While the award of money is an important factor to consider when determining which party prevailed, it is not the sole focus of the

inquiry. E.C.A. Envtl. Management Services, Inc. v. Toenyes (1984), 208 Mont. 336, 345, 679 P.2d 213, 217-18. In a case such as this, where the parties have mutually breached the same contract, the District Court did not err by refusing to grant either party attorney fees.

We affirm the District Court.

_____
Justice

We Concur:

_____
Chief Justice

_____
_____
_____
Justices

- 11 -