DA 08-0220

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 458

AVANTA FEDERAL CREDIT UNION,

Plaintiff and Appellant,

v.

STEVE SHUPAK,

Defendant, Appellee and Cross-Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 06-0545
Honorable Ingrid G. Gustafson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

James A. Patten; Patten, Peterman, Bekkedahl & Green, P.L.L.C.;
Billings, Montana

For Appellee:

Steven Reida; Landoe, Brown, Planalp & Reida, P.C.; Bozeman, Montana

Submitted on Briefs:  March 25, 2009

Decided:  December 31, 2009

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Avanta Federal Credit Union (Avanta) brought suit in the Thirteenth Judicial District Court, Yellowstone County, against Steve Shupak to recover the money it provisionally provided to Shupak when he cashed a fraudulent check from a German scam artist. Avanta also sought enforcement of rights under contracts entered with Shupak, including repossession of Shupak's vehicles to pay off the debt, repossession and recovery fees, attorney fees, and costs. Shupak raised the defense of equitable estoppel and counterclaimed, claiming negligent misrepresentation of the validity of the check to him, fraud, and punitive damages. The District Court granted summary judgment to Avanta on its right to charge back the provisional settlement funds given to Shupak, and the case proceeded to trial on the remaining issues. The jury found that Avanta employees had negligently misrepresented the validity of the check and that Shupak was contributorily negligent, finding damages of $5,000, and rendered an estoppel verdict preventing Avanta from enforcing its contract rights. After trial, the District Court denied Shupak's request to estop Avanta's charge-back right, but concluded that Shupak was the prevailing party and awarded him costs and attorney fees of $48,916.85.

¶2     Both Avanta and Shupak appeal from the judgment, raising various issues regarding equitable estoppel, sufficiency of the evidence, and the court's determination of the prevailing party. We affirm in part, reverse in part, and remand for further proceedings.

¶3     We restate the issues as follows:

2

¶4  1.  Did the District Court err in concluding that the jury's estoppel verdict was not applicable to Avanta's statutory and contractual right to charge back?

¶5  2.  Was there sufficient evidence to support the jury's verdict that Avanta was estopped from asserting other rights under the agreements, including repossession of Shupak's vehicles, recovery fees, and related attorney fees and costs?

¶6  3.  Did the District Court err in denying Avanta its attorney fees and costs related to the charge back, and determining that Shupak was the prevailing party?

## BACKGROUND

¶7  In May 2005, Steve Shupak fell prey to a fraudulent check scheme.  The scheme began when Shupak was contacted by a German "buyer" inquiring about the purchase of an automobile owned by Shupak's parents.

¶8  In 1989, Shupak signed a Membership Agreement and became a member of the Montana Media Credit Union, which later merged with Avanta.  Shupak held an Avanta checking account, savings account, and a joint checking account with his parents.  He also obtained two car loans from Avanta and, in conjunction with those transactions, executed two loan and security agreements, or "Loan Liner agreements."  The loan liner agreements provided the following cross-collateralization provision:

> The Property secures the Loan and any extensions, renewals or refinancings of the Loan.  If the Property is not a dwelling, it also secures any other loans, including any credit card loan, you have now or receive in the future from us and *any other amounts you owe us for any reason now or in the future* . . . . [Emphasis added.]

Both the membership and loan liner agreements provided for attorney fees and costs in collecting any debts owed to Avanta by Shupak.

3

¶9      In 2005, Shupak's mother, Wilma, decided to sell her 1993 Suzuki Sidekick vehicle, which had 200,000 miles on it. Wilma did not obtain the "Bluebook" value of the Sidekick, but determined the sales price by how much her husband thought it might be worth and how much money they needed for bills. Wilma received a few local inquiries regarding the Sidekick, but no sale occurred. Then, one day while Shupak was visiting his parents, Wilma received a call from a potential buyer in Germany expressing interest in the Sidekick. Because she was having trouble hearing the individual on the phone, Wilma handed the phone to Shupak to broker the deal. The German explained to Shupak that Suzukis were hard to find in Germany, and he had a client interested in buying it. Eventually Shupak and the German reached an agreement for the sale of the Sidekick for $7,400.

¶10     Approximately a month after the phone call, Tom and Wilma received what appeared to be a Washington Mutual Bank cashier's check, written to "Stove Shupak" for $11,500. The German immediately contacted Shupak, and instructed him to wire the extra $4,100 to the "shipper" in Brussels, Belgium. The "shipper" would then make arrangements to ship the car from Montana to Europe.

¶11     After receiving the check, Shupak called Avanta's Red Lodge branch, and inquired with the branch manager about cashing the check. Shupak inquired whether there would be a problem cashing the check because of the misspelling of his name, as well as whether the Red Lodge branch had sufficient cash on hand to cash the $11,500 check. Avanta branch manager Laura Getz informed Shupak that the credit union could cash the check despite the misspelling, and that sufficient cash was on hand.

4

¶12 On May 3, 2005, Shupak presented the check to Avanta teller, Bonnie Palmer. Palmer advised Shupak that the amount of the check was beyond her authority and that she needed approval from the assistant manager. Shupak insisted that the check had already been approved to be cashed, but Palmer nonetheless sought and obtained approval to cash the check from the assistant manager on duty, Jolene Collins, who was the only other employee present. Palmer testified that the check appeared unusual to her, in that there was no address listed under Washington Mutual on the check, and Shupak's name was misspelled. Both Getz and Palmer testified that they would have placed a hold on the check if they had handled the transaction. The employees also testified that it would have been inappropriate to tell Shupak the check was "good" or "secure." However, Shupak and Wilma testified that when Shupak presented the check to Palmer, she told him the check was "secure." Shupak also testified that he asked Palmer if he needed to wait for the funds to clear, and Palmer responded no.

¶13 Despite the unusualness of the check, Collins authorized cashing of the check. Shupak received $7,000 in cash, and requested $500 to be applied to one of his Avanta vehicle loans and $4,000 to be deposited in his account. Several days later, Shupak wired $4,100 to Belgium via Western Union. On May 16, 2005, the Washington Mutual check was returned to Avanta as counterfeit. Avanta then charged back Shupak's account for $11,500, leaving his account $9,238.96 overdrawn and his vehicle loan past due. Thereafter, Avanta applied several of Shupak's direct deposit checks to his negative account balance, bringing down the total owed to $8,185.97.

5

¶14 Shupak reported the scam to numerous authorities, and attempted to negotiate the overdraft liability with Avanta. When these efforts were unfruitful, Shupak sought to end all relations with Avanta. Shupak secured a home equity loan to pay off his Avanta vehicle loans. In June 2005, Shupak went to Avanta and tendered money to pay off those vehicle loans. Testimony at trial was disputed as to whether Avanta employees advised Shupak before or after he tendered the money, that even though the car loans were paid off, Avanta would continue to assert liens on his cars for the charge-back debt pursuant to the cross-collateralization provisions of the loan liner agreements.

¶15 Avanta hired J&S Recovery to repossess Shupak's vehicles to recover the outstanding account balance, but the repossession efforts were unsuccessful. Over the following months, Shupak received monthly account statements from Avanta stating an increasing negative balance, reflecting the assessment of additional attorney and repossession fees. The negative balance eventually grew to over $22,000.

¶16 Avanta sued Shupak in May 2006 to recover the outstanding balance, asserting its right to charge back the fraudulent check funds, and seeking repossession of Shupak's vehicles, repossession fees, and all attorney fees and costs of suit. Shupak raised several affirmative defenses, including estoppel, and countersued for negligence, malicious prosecution, breach of the duty of good faith under the UCC, breach of the Fair Debt Collection Practices Act, and fraud.

¶17 The District Court concluded Avanta had a statutory right to charge back the money given Shupak for the fraudulent check, pursuant to § 30-4-212, MCA, and our holding in *Valley Bank of Ronan v. Hughes*, 2006 MT 285, 334 Mont. 335, 147 P.3d 185,

6

and accordingly granted Avanta partial summary judgment. However, the court reserved judgment against Shupak as to the $8,185.97 account deficit until a jury could determine whether Shupak was entitled to offset that amount because of Avanta's alleged negligent misrepresentations regarding the validity of the check.

¶18 After trial on Shupak's claims of negligence, negligent misrepresentation, fraud, estoppel, and punitive damages, the jury found by special verdict that Avanta had been 77.5% negligent, Shupak had been 22.5% negligent, the negligence had caused $5,000 in damages, and Avanta was estopped from enforcing its membership and loan liner agreements.[1] The jury rejected Shupak's fraud and punitive damage claims. Thus, Shupak was awarded $3,875.00 for Avanta's negligence. The District Court subtracted that amount from the $8,185.97 owed to Avanta by reason of the charge-back right, awarding a net judgment to Avanta in the amount of $4,310.97.

¶19 Both parties sought recovery of their respective attorney fees and costs. The District Court determined Shupak was the prevailing party because he had prevailed on his negligence claims and reduced his financial liability to Avanta, despite Avanta prevailing on the charge-back issue and recovering a net judgment. The court awarded Shupak his attorney fees and costs of $48,916.85, for a net judgment in his favor of $44,605.88.

¶20 Avanta appeals, challenging the sufficiency of the evidence supporting the jury's estoppel verdict and the District Court's determination that Shupak was the prevailing

---

[1] The special verdict form contained a single estoppel question: "Q9. Is Avanta estopped from relying on the provisions of its member agreement or loan liner agreements?"

party, with the resulting award of attorney fees and costs to Shupak. Shupak cross-appeals the District Court's application of the estoppel verdict, arguing that Avanta should be estopped from charging back the provisional funds given to Shupak for the fraudulent check. Shupak also seeks his attorney fees and costs on appeal.

## STANDARD OF REVIEW

¶21 The scope of our review of the jury's verdict is narrow. We only determine whether there is substantial credible evidence in the record supporting the jury's verdict. *Barrett v. Asarco Inc.*, 245 Mont. 196, 200, 799 P.2d 1078, 1080 (1990) (citation omitted). "Substantial credible evidence is defined as 'evidence which a reasonable mind might accept as adequate to support a conclusion.'" *Baltrusch v. Baltrusch*, 2003 MT 357, ¶ 32, 319 Mont. 23, 83 P.3d 256 (quoting *Lee v. Kane*, 270 Mont. 505, 510, 893 P.2d 854, 857 (1995)). The evidence must be viewed in the light most favorable to the prevailing party. *Bugger v. McGough*, 2006 MT 248, ¶ 37, 334 Mont. 77, 144 P.3d 802 (citation omitted).

¶22 The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. *Gelderloos v. Duke*, 2004 MT 94, ¶ 22, 321 Mont. 1, 88 P.3d 814 (citing *Brumit v. Lewis*, 2002 MT 346, ¶ 12, 313 Mont. 332, 61 P.3d 138). Whether a party is entitled to recover attorney fees is strictly a question of law; we review a district court's conclusions of law regarding attorney fees to determine whether those conclusions are correct. *Chase v. Bearpaw Ranch Assn.*, 2006 MT 67, ¶ 14, 331 Mont. 421, 133 P.3d 190 (quoting *Transaction Network, Inc. v. Wellington Techs., Inc.*, 2000 MT 223, ¶ 17, 301 Mont. 212, 7 P.3d 409).

8

**1. Did the District Court err in concluding that the jury's estoppel verdict was not applicable to Avanta's right to charge back?**

¶24 Prior to trial, Avanta moved for partial summary judgment on its charge-back right, citing § 30-4-212(4), MCA (2007), as well as our decision in *Valley Bank of Ronan v. Hughes*, 2006 MT 285, 334 Mont. 335, 147 P.3d 185. Shupak opposed the motion, arguing that factual questions existed regarding Avanta's handling of the fraudulent check under the statutory "ordinary care" standard of § 30-4-212(4), MCA. The District Court granted Avanta's summary judgment motion, finding that the bank had a statutory right to charge back the fraudulent check funds on Shupak's account without regard to any alleged negligence by Avanta.

¶25 After trial on the remaining issues, the jury found that Avanta was estopped from enforcing its membership agreement and loan liner agreements. The verdict form did not distinguish between the right of charge-back and other contractual rights. Shupak then argued that, despite the District Court's summary judgment on the charge-back right, the jury's verdict should also estop Avanta from charging back the $11,500 sum it had provisionally granted when he deposited the fraudulent check. Avanta contended it had the right to charge back the $11,500 to Shupak's accounts as a matter of law, as well as collect the attorney fees it had incurred in pursuing that right. The District Court ruled that the jury's estoppel verdict could not prevent Avanta from its charge-back right, as it was also rooted in statute. However, the District Court held that the jury's estoppel verdict prevented Avanta from otherwise enforcing its agreements, including

9

enforcement of its cross-collateralization right, repossession rights, and collection of attorney fees and costs. The parties raise the same arguments on appeal.

¶26 In *Hughes*, we explained that when a customer deposits a check, the depositary bank or institution will often credit the customer's account immediately and permit the customer to draw on these "provisional settlement" funds. *Hughes*, ¶ 17. Banks commonly provide provisional settlement funds because more than ninety-nine percent of deposited checks are later honored by the drawee bank, or finally settled. Section 30-4-212, MCA, Official Comment 1. However, if the customer's check is subsequently dishonored by the drawee bank, the depositary bank may "charge back" the provisional funds made available to the customer. By this procedure, the UCC "encourages the provisional settlement process by protecting a depositary bank from fraudulent or otherwise unenforceable check deposits." *Hughes*, ¶ 17.

¶27 Courts and commentators have long recognized the reasoning behind UCC § 4-212, which establishes a bank's right to charge back the provisional settlement funds. Were this not the rule, banking institutions would be placed "in the untenable position of guaranteeing a customer's [checks] whenever the bank gives a provisional settlement." *Southside Natl. Bank v. Hepp*, 739 S.W.2d 720, 723 (Mo. 1987); *see Kacak v. Bank Calumet, N.A.*, 869 N.E.2d 1239, 1240 n. 2 (Ind. App. 2007) ("it is the customer, not the bank, who ultimately bears the risk of nonpayment of items presented to the bank"). Such a practice would promote fraud, allowing customers to withdraw funds without regard to final settlement or notice of dishonor. *Hepp*, 739 S.W.2d at 723. Moreover, "[i]f there is a policy implicit in the UCC's rules for the allocation of losses due to fraud,

it surely is that the loss be placed on the party in the best position to prevent it." *Northpark Natl. Bank v. Bankers Trust Co.*, 572 F. Supp. 524 (S.D.N.Y. 1983); *Allen v. Carver Fed. Sav. and Loan Assn.*, 477 N.Y.S.2d 537, 538-39 (N.Y. App. Div. 1st Dept. 1984); Robert A. Hillman, Julian B. McDonnell & Steve H. Nickles, *Common Law and Equity under the Uniform Commercial Code* § 14.01[1] (Warren, Gorham & Lamont, Inc. 1985) ("[O]ur law of check fraud seeks to discourage fraud (or at least to reduce its costs) by placing the loss on the party whose negligence allowed the scheme to succeed or who was in the best position to prevent its occurrence.").

¶28 By allocating the risk of loss to the banking customer until the check is finally settled, the negotiability of commercial paper is enhanced, if not made commercially certain. Hillman, McDonnell & Nickles, *Common Law and Equity under the Uniform Commercial Code* at § 14.01[1]. As the New York Court of Appeals noted, "by 'prospectively establishing rules of liability that are generally based not on actual fault but on allocating responsibility to the party best able to prevent the loss by the exercise of care, the UCC not only guides commercial behavior but increases certainty in the marketplace and efficiency in dispute resolution.'" *Call v. Ellenville Natl. Bank*, 774 N.Y.S.2d 76, 78 (N.Y. App. Div. 2d Dept. 2004) (citations omitted); *see* William D. Hawkland, J. Fairfax Leary, Jr. & Richard M. Alderman, *Uniform Commercial Code Series* vol. 5, § 4-212:1 (West 1999) ("This rule is consistent with the general approach of Article 4; the collecting bank is merely an agent for collection."); Barkley Clark & Barbara Clark, *The Law of Bank Deposits, Collections and Credit Cards* vol. 1,

¶ 6.01[1]-[5] (Rev. ed., A.S. Pratt & Sons Supp. 2005) (detailing the bank's charge-back right of the provisional settlement until final payment).

¶29 The bank's right to "charge back" is codified at UCC § 4-212, and, in the Montana Code, at § 30-4-212, MCA. The Montana statutes mirror the UCC provisions, providing that "[t]he right to charge back is not affected by: . . . failure by any bank to exercise ordinary care with respect to the item but any bank so failing remains liable." Official Comment 5 to § 30-4-212(4), MCA, further explains that "charge-back is permitted even where nonpayment results from the depositary bank's own negligence." Applying this statute, we held in *Hughes* that the bank has a statutory right to charge back the provisional settlement funds, preempting any claim that the bank did not exercise ordinary care. *Hughes*, ¶ 22. However, we also held that the statute did *not* preempt common law claims related to the bank's communications, such as negligent misrepresentations made to the customer, which the customer could pursue to recover his damages. *Hughes*, ¶ 23. "Therefore, while Hughes bore the obligation to repay Valley Bank to satisfy the bank's right of charge-back under § 30-4-212, MCA, it nevertheless [was] possible for Hughes to obtain a judgment to compensate him for the charge-back debt." *Hughes*, ¶ 23 (citing *First Georgia Bank v. Webster*, 308 S.E.2d 579, 581 (Ga. App. 1983); Henry J. Bailey & Richard B. Hagedorn, *Brady on Bank Checks* ¶ 24.05 n. 84 (8th ed., A.S. Pratt & Sons 1999)).

¶30 In *Hughes* we recognized several cases which supported our conclusion that equitable principles supplement the UCC. *Hughes*, ¶ 23 n. 4 (citing *First Natl. Bank of Denver v. Ulibarri*, 557 P.2d 1221 (Colo. App. 1976); *Webster*, 308 S.E.2d 579; *Symonds*

*v. Mercury Sav. & Loan Assn.*, 275 Cal. Rptr. 871 (Cal. App. 2d Dist. 1990); *Burke v. First Peoples Bank of N.J.*, 412 A.2d 1089 (N.J. Dist. Ct. 1980)). However, we did not address whether equitable estoppel might prevent the bank from exercising its charge-back rights because the parties did not raise that issue on appeal. *Hughes*, ¶ 23 nn. 4-5. We are now presented with that question.

¶31 The UCC and Montana's statutory scheme provide clear guidance on the bank's right to charge back the provisional settlement funds.[2] If a depositary bank has made provisional settlement funds available to its customer, and the deposited check subsequently fails by reason of dishonor, suspension or otherwise, § 30-4-212(1), MCA, provides:

> [T]he bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the [check] if by its midnight deadline[3] or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.

The statute further provides that the bank does not lose its right to revoke settlement, charge back the credit or obtain a refund from the customer if it delays sending the return or notice of dishonor past its midnight deadline or a longer reasonable time after learning the facts, but will be liable for any loss resulting from the delay. Section 30-4-212(1), MCA. However, the bank's "rights to revoke, charge back and obtain refund terminate if

---

[2] Because the Montana statutes mirror the UCC provisions, we will hereafter refer to the applicable Montana statutes.

[3] Section 30-4-104(1)(i), MCA, defines "midnight deadline" "with respect to a bank [as] midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." "Banking day" is likewise defined at § 30-4-104(1)(c), MCA.

and when a settlement for the [check] received by the bank is or becomes final." Section 30-4-212(1), MCA.[4] As we explained in *Hughes*, "[t]his practice is known in Uniform Commercial Code parlance as 'provisional settlement' because the bank has not yet presented the check to the drawee bank and received payment from the check maker's account (which would constitute 'final settlement')." *Hughes*, ¶ 17.

¶32 The bank's charge-back right thus terminates only upon the final settlement of the check. The bank's right to charge back is not affected by the customer's use of the provisional settlement funds, or the bank's failure to exercise ordinary care in handling the check for settlement purposes. Section 30-4-212(4)(a)-(b), MCA; *see* § 30-4-212, MCA, Official Comment 5. While principles of law and equity supplement the UCC, those principles do not displace provisions of the UCC. Section 30-1-103, MCA. Applying equitable estoppel as argued by Shupak would displace the clear statutory provision of a bank's right to charge back, and an equitable remedy cannot do so. Until a check becomes final, the depositary bank has the right to charge back provisional settlement funds to the customer, and the risk of loss remains with the customer.[5]

---

[4] Subsections (3) and (4) of 30-4-211, MCA, and subsections (2) and (3) of 30-4-213, MCA, determine when settlement becomes final. Section 30-4-212(1), MCA.

[5] Official Comment 5 to § 30-4-212, MCA, provides both the rule and the policy behind the bank's charge-back right:

> The rule of subsection (4) relating to charge-back (as distinguished from claim for refund) applies irrespective of the cause of the nonpayment, and of the person ultimately liable for nonpayment. Thus charge-back is permitted even where nonpayment results from the depositary bank's own negligence. Any other rule would result in litigation based upon a claim for wrongful dishonor of other checks of the customer, with potential damages far in excess of the amount of the item. Any other rule would require a bank to determine difficult questions of fact.

14

¶33　In holding that the bank's charge-back right cannot be equitably estopped, we join other courts which have held similarly. *See Ratner v. Central Natl. Bank of Miami*, 414 So. 2d 210, 213 (Fla. 3d Dist. App. 1982); *Wells Fargo Bank v. Hartford Natl. Bank and Trust Co.*, 484 F. Supp. 817, 822-23 (D. Conn. 1980); *Holcomb v. Wells Fargo Bank, N.A.*, 66 Cal. Rptr. 3d 142 (Cal. App. 4th Dist. 2007); *see Hepp*, 739 S.W.2d at 722-23. Both the *Ratner* and *Wells Fargo Bank* courts recognized the bank's statutory right to charge back the provisional settlement funds, as well as the customer's right to pursue affirmative relief by complaint or counterclaim. *Ratner*, 414 So. 2d at 213; *Wells Fargo Bank*, 484 F. Supp. at 822-23. The California Court of Appeals likewise recognized that, even though the UCC furnished the bank "with *an absolute right to charge back the check* upon [the drawee bank's] dishonor, it does not shield [the depositary bank] from damages due to its branch manager's alleged negligent misrepresentations regarding the check's status." *Holcomb*, 66 Cal. Rptr. 3d at 148 (emphasis added).

¶34　A customer cannot prevent a bank from charging back the provisional settlement funds. Section 30-4-212, MCA, provides for both the charge-back right and the termination of that right, and thus displaces common law and equitable defenses, such as estoppel. However, as explained in cases such as *Hughes* and *Holcomb*, the customer who detrimentally relies on the negligent misrepresentations of the bank's agents, and thereby suffers damage, is not without recourse. A cause of action for damages based on principles of common law or equity, by complaint or counterclaim, may be brought

---

The customer's protection is found in the general obligation of good faith (Sections 30-1-203 and 30-4-103) . . . .

against the bank. This process preserves the UCC's carefully drawn balance between "certainty and predictability in commercial transactions," and the "comparative fault principles taken from tort law," *Call*, 774 N.Y.S.2d at 78, and is consistent with our decision in *Hughes*, as well as a majority of courts and banking commentators. Moreover, this determination logically addresses the actual harm to the parties. Rather than estopping the bank from charging back the entire provisional settlement, an arguably arbitrary measure of damages, the customer may sue in negligence or negligent misrepresentation and recover the actual harm caused by the bank.

¶35 Thus, the District Court correctly determined that the jury's estoppel verdict did not apply to Avanta's statutory and contractual right to charge back the provisional settlement funds credited to Shupak's account. We acknowledge the early cases cited by Shupak in which courts have found equitable estoppel applicable to the bank's right to charge back, *Webster*, 308 S.E.2d at 581-82 and *Ulibarri*, 557 P.2d at 1223. Given the authority cited herein, we decline to adopt these holdings. They represent a minority position and the development of the law in the years since has been to the contrary.

¶36 We conclude that the District Court properly granted summary judgment to Avanta regarding its charge-back right, and properly rejected application of the jury's estoppel verdict to the right. The District Court likewise correctly permitted Shupak to pursue his separate claims for the damages suffered by reliance on Avanta's negligent misrepresentations.

16

¶37 ***2. Was there sufficient evidence to support the jury's verdict that Avanta was estopped from asserting other rights under the agreements, including repossession of Shupak's vehicles, recovery fees, and related attorney fees and costs?***

¶38 Avanta argues there was insufficient evidence to support the jury's estoppel verdict. Avanta contends that, even if it is estopped from relying on the terms of the loan liner agreement, the estoppel verdict should not affect the membership agreement it had with Shupak. According to Avanta, to equitably estop both the membership and loan liner agreements, Avanta must have misrepresented or concealed a material fact about both of those agreements to Shupak.

¶39 Shupak argues he presented sufficient evidence to prove Avanta misrepresented the validity of the check, and failed to explain to him that the cross-collateralization loan liner agreements permitted Avanta to repossess his vehicles upon default of any account, even though he had paid off the vehicle loans. Shupak claims the jury correctly estopped Avanta's enforcement of its agreements, as well as the repossession of Shupak's vehicles, given that the debt occurred solely because of Avanta's negligent misrepresentations.

¶40 The membership agreement provided the following liability policy regarding available funds:

> Please remember that even after we have made funds available to you and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

According to the loan liner agreements, Shupak agreed to the following cross-collateralization policy:

> The Property secures the Loan and any extensions, renewals or refinancings of the Loan. If the Property is not a dwelling, it also secures any other

loans, including any credit card loan, you have now or receive in the future from us and *any other amounts you owe us for any reason now or in the future . . . .* [Emphasis added.]

¶41 The doctrine of equitable estoppel is predicated on equity and good conscience, and will grant relief to prevent a party from suffering a gross injustice at the hands of the other party who brought about the situation or condition. *In re Shaw,* 189 Mont. 310, 316, 615 P.2d 910, 914 (1980); *In re Estate of Stukey*, 2004 MT 279, ¶ 37, 323 Mont. 241, 100 P.3d 114 (citing *Dagel v. Great Falls*, 250 Mont. 224, 235, 819 P.2d 186, 193 (1991)). Although not generally favored, estoppel will be found "to prevent a party from taking an unconscionable advantage of his own wrong while asserting his strict legal right." *Shaw,* 189 Mont. at 316, 615 P.2d at 914 (citation omitted); *Stukey*, ¶ 37 (citing *Dagel*, 250 Mont. at 235, 819 P.2d at 193); *Kenneth D. Collins Agency v. Hagerott*, 211 Mont. 303, 310, 684 P.2d 487, 490-91 (1984).

¶42 A party must prove, by clear and convincing evidence, the following six elements to succeed on an estoppel claim: (1) the existence of conduct, acts, language, or silence amounting to a representation or a concealment of a material fact; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least the expectation, that it will be acted upon by the other party, or under circumstances both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party and, thus relying, he must be led to act upon it; and (6) he must in fact act

upon it in such a manner as to change his position for the worse. *Stuckey*, ¶ 38 (citation omitted).

¶43    From a review of the record, we conclude that Shupak presented sufficient evidence that Avanta induced his reliance on the fraudulent check's validity, and Avanta was therefore appropriately estopped from pursuing remedies under the membership and loan liner agreements beyond the charge back. Avanta employees testified that the check contained several red flags, such as a missing address for the Washington Mutual check, as well as Shupak's misspelled first name "Stove Shupak." Given the unusual characteristics of the check, the employees conceded it would have been inappropriate to tell Shupak the check was "good" or "secure." Nonetheless, both Shupak and his mother testified that Avanta employees assured Shupak the Washington Mutual check was "secure," and that it was not necessary for him to wait for the funds to clear. Shupak then acted upon Avanta's assurance, cashing the check, making a vehicle loan payment, and giving money to his parents to pay bills. Several days later, he wired $4,100.00 to the "shipper" in Belgium.

¶44    The evidence regarding Avanta's negligent misrepresentations regarding the check's validity is sufficient to establish estoppel. We reject Shupak's contention that Avanta's failure to inform him of the cross-collateralization provisions of the loan liner agreements, when he paid off the vehicle loans, without more, constituted concealment of a material fact. Avanta was not required, by law or equity, to remind Shupak of the contents of the agreements he had signed before accepting his payoff. However, the other evidence was sufficient to support the estoppel verdict and, accordingly, we affirm

that verdict. As explained above, the jury's estoppel verdict could not apply to Avanta's right to charge back the provisional settlement funds, nor will it apply to Avanta's attorney fees insofar as they relate to the charge-back right, as discussed below.

¶45 **3. Did the District Court err in denying Avanta its attorney fees and costs related to the charge back, and determining that Shupak was the prevailing party?**

¶46 Traditionally, courts will not award attorney fees unless specifically provided for by contract or statute. *Terra West Townhomes, L.L.C. v. Stu Henkel Realty*, 2000 MT 43, ¶ 40, 298 Mont. 344, 996 P.2d 866 (citation omitted). The membership agreement provided for payment of Avanta's attorney fees and costs in the event it prevailed in litigation between the parties. Because the agreements provided Avanta a right to attorney fees, Shupak was likewise entitled to attorney fees if he prevailed, pursuant to § 28-3-704, MCA. Similarly, under § 25-10-101(3), MCA, a litigant is entitled to costs if he receives a judgment in an action to recover sums or damages in excess of $50.

¶47 Shupak resisted the charge back and forced Avanta to litigate the issue. As explained above, Avanta had a right to charge back which could not be equitably estopped, and the jury's verdict thus did not prevent Avanta from pursuing this remedy. Avanta is entitled to that portion of its attorney fees and costs related to the enforcement of its charge-back right, as a matter of law. The District Court accordingly erred in denying Avanta those fees and costs.[6]

---

[6] We note that Avanta substantially prevailed on the charge-back issue upon the entry of summary judgment, and that the trial was conducted on Shupak's claims and defenses. The charge-back issue then arose again in post-trial motions.

¶48 The District Court concluded that Shupak was the prevailing party because his liability to Avanta had been reduced and because he had prevailed on his negligence and estoppel claims. Avanta argues the court erred in determining that Shupak was the prevailing party because Avanta prevailed on the main issue—Shupak's liability for the provisional settlement funds he received from Avanta followed by the failure to achieve final settlement. Avanta thus contends it is the prevailing party, and as such is entitled to full costs and attorney fees. Shupak counters that the key issue was rather Avanta's negligent misrepresentations, and the District Court correctly found him to be the prevailing party.

¶49 We have previously held that the "prevailing party is the one who has an affirmative judgment rendered in his favor at the conclusion of the entire case." *Schmidt v. Colonial Terrace Assocs.*, 215 Mont. 62, 68, 694 P.2d 1340, 1344 (1985) (quoting *Jordan v. Elizabethan Manor*, 181 Mont. 424, 434, 593 P.2d 1049, 1055 (1979)). While a money award is not dispositive, *E.C.A. Envtl. Mgt. Servs. v. Toenyes*, 208 Mont. 336, 345, 679 P.2d 213, 217-18 (1984), we have explained that, generally, the party receiving the net judgment is considered the prevailing party in an action involving a counterclaim. *Rod and Rifle Inn, Inc. v. Giltrap*, 273 Mont. 232, 235, 902 P.2d 38, 41 (1995) (citing *Empire Dev. Co. v. Johnson*, 236 Mont. 433, 441, 770 P.2d 525, 530 (1989)). Although agreeing that Avanta had achieved a net judgment in its favor, exclusive of attorney fees and costs, in the amount of $4,310.97, the District Court nonetheless determined that Shupak was the prevailing party. We disagree.

¶50 Avanta initiated the litigation to enforce its charge-back rights and recover the provisional settlement funds issued to Shupak, and prevailed on this claim. Avanta was likewise entitled to that portion of its attorney fees and costs incurred to enforce its charge-back right. Shupak prevailed on his estoppel defense for other contract remedies sought by Avanta, and prevailed on his negligence claims. The jury determined the damages were $5,000, and found Avanta to be 77.5% and Shupak 22.5% negligent, resulting in a damage award to Shupak of just $3,875.00. Shupak lost his fraud and punitive damage claims. Thus, despite the jury's verdict that Avanta acted negligently, Avanta still recovered a net judgment against Shupak when the verdicts were offset, without considering Avanta's right to collect related attorney fees. "The party that survives an action involving a counterclaim, setoff, refund or penalty with the net judgment should generally be considered the successful or prevailing party." *Toenyes*, 208 Mont. at 345, 679 P.2d at 218 (citations omitted). Given these circumstances, we conclude the District Court erred in determining Shupak to be the prevailing party. Avanta is properly considered the prevailing party.

**CONCLUSION**

¶51 The jury's verdict was supported by substantial evidence and is affirmed.

¶52 Post-trial, the District Court correctly determined that Avanta's right to charge back the provisional settlement funds given to Shupak was not estopped by the jury's verdict, and that order is affirmed.

¶53 The District Court erred by failing to award that portion of Avanta's attorney fees and costs related to enforcement of its charge-back right. Upon remand, the District

22

Court will determine what fees were reasonably incurred for that purpose only. Attorney and other fees incurred by Avanta to enforce other rights are estopped in accordance with the jury's verdict. The District Court's determination that Shupak was the prevailing party was in error. These orders are reversed, and the judgment is reversed. Following further proceedings as provided herein, the District Court shall enter an amended judgment.

¶54 Affirmed in part, reversed in part, and remanded for further proceedings.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER