FILED

February 24 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0014

DA 14-0014

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2015 MT 52

MC, INC., a Montana Corporation,
PLAYERS, INC., a Montana Corporation,
DOUGLAS PALAGI, an individual, and
K.C. PALAGI, an individual,

      Plaintiffs and Appellees,

  v.

CASCADE CITY-COUNTY BOARD OF
HEALTH, a Local Board of Health,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDV-12-0052(A)
Honorable Greg Pinski, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Mark F. Higgins; Cathy J. Lewis, Ugrin, Alexander, Zadick & Higgins, PC; Great Falls, Montana

          Brian J. Hopkins; Carey Ann Shannon, Cascade County Attorney's Office; Great Falls, Montana

      For Appellees:

          Gregory G. Smith; Stephanie A. Oblander, Smith Oblander; Great Falls, Montana

      For Amici:

          Brian J. Miller, Morrison, Sherwood, Wilson & Deola PLLP; Helena, Montana (American Cancer Society Cancer Action Network, Inc.)

          Shannon McDonald, Special Assistant Attorney General; Helena, Montana (Department of Public Health and Human Services)

Submitted on Briefs:  November 19, 2014
Decided:  February 24, 2015

Filed:

_____
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1     The Cascade City-County Board of Health (Board) appeals two orders of the Eighth Judicial District Court, Cascade County.  The first order granted summary judgment and declaratory relief to MC, Inc., Players, Inc., Douglas J. Palagi, and K.C. Palagi (collectively, Casino Owners).  The District Court determined that two smoking structures owned by the Casino Owners were in compliance with the Montana Clean Indoor Air Act (MCIAA).  The second order awarded the Casino Owners attorney fees that were incurred in the preliminary injunction proceeding.  We reverse both orders.

¶2     *1.  Did the District Court err by granting the Casino Owners' motion for summary judgment?*

¶3     *2.  Did the District Court abuse its discretion by awarding attorney fees to the Casino Owners for the preliminary injunction proceeding?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶4     The Casino Owners own and operate Golds Casino and Players Casino in Great Falls.  In 2011, the Casino Owners constructed smoking structures or shelters that were attached to the casinos.  The structures have four walls, including a common wall with the casinos with multiple large glass windows, inside entrances, a roof, carpeting, heating, air conditioning, electricity, and gaming machines.  The structures also have several small openings near the top of the exterior walls that are several inches high and several feet wide.  The openings run parallel to the ceiling, are not obstructed from the inside of the structure, have a cover on the outside, and have no mechanism for closure.

3

Except for the openings, the structures have all the appearances of being an enclosed structure. The Casino Owners require adults who enter the structures to join a "Smokers' Club."

¶5 After construction, Casino Owners sought approval from the City Building Department, Fire Department, and the Board for the structures. Jim Page, a license architect retained by the Casino Owners, submitted the smoking structures' blue prints to the three respective agencies and the agencies subsequently approved them. On August 22, 2011, after inspecting the structure located at Golds Casino, Bruce Treis, the Registered Sanitarian and Environmental Health Specialist for the Board, approved the structure, indicating it met all of the Department of Health standards. On September 2, 2011, Treis likewise approved the structure attached to Players Casino.

¶6 On November 7, 2011, Teddy Nault, Health Educator and Tobacco Prevention Specialist for the Board, received a purported anonymous complaint concerning smoking in the smoking structures; Nault later admitted to filing the complaint himself. Nault's complaint prompted the Board to commence enforcement steps under the MCIAA. The Board issued a letter of education, written warnings, and a reprimand letter serving as "final notice prior to legal action taking place."

¶7 In January 2012, the Casino Owners initiated an action against the Board seeking a declaration that the structures were in compliance with the MCIAA. The parties stipulated to a stay of the proceedings. On February 5, 2013, the District Court vacated the stay. On February 6, 2013, the Board moved for a preliminary injunction that would

4

prohibit the Casino Owners from allowing smoking in the structures. The District Court denied the Board's request. The court found it significant that several other casinos in Cascade County had constructed roofed smoking structures similar to the Casino Owners' structures; the Board had not initiated action against the several other casino owners; the Board refused to adopt an articulable standard for determining whether structures fell under the MCIAA; the Board delayed filing its motion for a over a year after litigation commenced; and ultimately the Board appeared to be punishing the Casino Owners for seeking a legal declaration. The Board did not appeal the denial of its motion for a preliminary injunction.

¶8 The Casino Owners moved for summary judgment. The Board filed a cross-motion for summary judgment. During discovery, the Board admitted that the small openings made the structures "partially open to the outside air." The District Court did not interpret any of the MCIAA's provisions, but reasoned that "the Board's admissions establish the MCIAA is inapplicable to [Casino Owners'] shelters." The Court granted summary judgment to Casino Owners, noting that, had the Board "not made those admissions, the case may have resulted in a different analysis of the MCIAA and its application here." Thereafter, the District Court awarded attorney fees to the Casino Owners for the costs associated with the Board's motion for a preliminary injunction.

¶9 The Board appeals the District Court's grant of summary judgment and the award of attorney fees.

## STANDARD OF REVIEW

¶10    We review a district court's summary judgment order de novo, based on the same criteria applied by the district court. *Lewis & Clark Cnty v. Hampton*, 2014 MT 207, ¶ 22, 376 Mont. 137, 333 P.3d 205. We determine whether the district court applied the law correctly. *Hardy v. Vision Service Plan*, 2005 MT 232, ¶ 10, 328 Mont. 385, 120 P.3d 402. We review a district court's interpretation and construction of a statute de novo. *State v. Triplett*, 2008 MT 360, ¶ 13, 346 Mont. 383, 195 P.3d 819.

¶11    We review a district court's determination of whether a statement constitutes a judicial admission for an abuse of discretion. *Bilesky v. Shopko Stores Operating Co.*, 2014 MT 300, ¶ 10, 377 Mont. 58, 338 P.3d 76. "Whether a statement is one of fact or law, for the purpose of determining if the statement should be considered a judicial admission, is a question of law we review for correctness." *Bilesky*, ¶ 10.

## DISCUSSION

¶12    *1. Did the District Court err by granting the Casino Owners' motion for summary judgment?*

¶13    The Board argues that the District Court erred in what should be "a simple case of statutory interpretation." It argues that "bars," which the MCIAA defines as including "casinos," are clearly delineated on the statute's list of public places wherein smoking is prohibited, and that the court erred by improperly applying discovery admissions that were immaterial to the interpretation of the statute. The Casino Owners respond with three arguments in support of their contention that the District Court did not err. First, they argue the structures are not subject to the smoking prohibition of the MCIAA.

6

Second, they argue the admission made by the Board in discovery constitutes a judicial admission and precludes the Board from contending the structures are not subject to the MCIAA. Lastly, they argue the Board should be equitably estopped from enforcing the MCIAA. We address these arguments in turn.[1]

*Applicability of the MCIAA*

¶14 We construe a statute by "reading and interpreting the statute as a whole, 'without isolating specific terms from the context in which they are used by the Legislature.'" *Triplett*, ¶ 25 (quoting *Mont. Sports Shooting Ass'n v. State*, 2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003). "Statutory construction is a holistic endeavor and must account for the statute's text, language, structure and object." *Triplett*, ¶ 25 (internal quotations omitted). We must also "read and construe each statute as a whole so as to avoid an absurd result and to give effect to the purpose of the statute." *Triplett*, ¶ 25 (internal quotations omitted).

¶15 The MCIAA provides that "smoking in an *enclosed public place* is prohibited." Section 50-40-104(1), MCA (emphasis added). The MCIAA defines "enclosed public place" as "an indoor area, room, or vehicle that the general public is allowed to enter or that serves as a place of work, including but not limited to the following: (a) restaurants;

---

[1] The Casino Owners offer a fourth argument regarding waiver. Because they make this argument for the first time on appeal, we will not address it. *See Gary & Leo's Fresh Foods, Inc. v. State*, 2012 MT 219, ¶ 16, 366 Mont. 313, 286 P.3d 1218.

(b) stores; . . . (h) bars . . . ." Section 50-40-103(3), MCA.[2] "Bar" is further defined as an "an establishment with a license issued pursuant to Title 16, chapter 4, that is devoted to serving alcoholic beverages for consumption by guests or patrons on the premises and in which the serving of food is only incidental to the service of alcoholic beverages or gambling operations. The term includes but is not limited to taverns, night clubs, cocktail lounges, and casinos." Section 50-40-103(1), MCA.

¶16 The parties initially dispute how this statutory structure—an operative definition of "enclosed public place" followed by the delineation of 11 named categories of places—is intended to be applied. Casino Owners argue their smoking structures must satisfy the definition of "enclosed public place" in order for smoking to be prohibited, but that the structures fail to do so because they are neither open to the "general public" nor serve as a "place of work." The Board argues it is unnecessary to analyze whether the smoking structures satisfy the operative definition of "enclosed public place," because "bars," which in turn is defined to include "casinos," are delineated on the list of places following the definition. Citing a dictionary definition, the Board offers that "casino" is defined as "a building or room used for social amusements; specifically: one used for gambling." The Board reasons that because the "smoking rooms contain gambling

---

[2] The entire listing of places set forth in the provision is as follows: "(a) restaurants; (b) stores; (c) public and private office buildings and offices, including all office buildings and offices of political subdivisions, as provided for in 50-40-201, and state government; (d) trains, buses, and other forms of public transportation; (e) health care facilities; (f) auditoriums, arenas, and assembly facilities; (g) meeting rooms open to the public; (h) bars; (i) community college facilities; (j) facilities of the Montana university system; and (k) public schools, as provided for in 20-1-220 and 50-40-104."

8

machines, and are therefore casinos (and are therefore bars)," the smoking structures are enclosed public places and thus subject to the MCIAA's prohibition on smoking. The Casino Owners respond that the Board's argument ignores the operative statutory definitions of "enclosed public place" and "bar," and argue that "[w]here a statute specifically includes a preceding definition to a list of examples, a court cannot ignore" that definition in applying the listed examples.

¶17 As noted above, we must consider the statute as a whole, its plain language, its structure and object, and, if possible, "give effect to all" of its provisions. Section 1-2-101, MCA. The structure of §§ 50-40-103(1) and -103(3), MCA, utilizes an operative definition followed by a list of items that are intended to be included within that definition. The "including but not limited to" language in § 50-40-103(3), MCA, incorporates other places into the statute if they, although not mentioned on the list, also satisfy the operative definition. The expressly listed places must likewise satisfy the operative definitions in §§ 50-40-103(1) and -103(3), MCA, and these provisions must be read together and interpreted accordingly. The proper working of these provisions is demonstrated by a simple illustration.

¶18 Suppose a mother tells her child to go to the market and purchase fresh organic vegetables, including but not limited to, carrots, collard greens, and cabbage. Clearly, the child would violate the instruction if she returned with a rotten, non-organic cabbage— despite the fact that cabbage was expressly included on the list of items to be purchased. The operative language of "fresh organic vegetable" informed the listed item of cabbage.

9

The same is true here: "enclosed public place," as that term is defined, informs the listed item of "bars" and other places, whether or not named on the list.

¶19 The Board's analysis of the statute would render meaningless the operative language within §§ 50-40-103(1) and -103(5), MCA, and substitute dictionary definitions for these statutory definitions. Although the Board offers that, under its dictionary definition, "casinos" are necessarily included within the term "bar," the Board's dictionary definition of casino is not consistent with the statutory definitions the Legislature has provided for "bar." "Bar" is defined in § 50-40-103(1), MCA, as "an establishment . . . in which the serving of food is only incidental to the service of alcoholic beverages or gambling operations. The term includes but is not limited to taverns, night clubs, cocktail lounges, and casinos." The term, "incidental to the service of alcoholic beverages or gambling operations," is further defined as meaning that "at least 60% of the of the business's annual gross income comes from the sale of alcoholic beverages or gambling receipts, or both." Section 50-40-103(5), MCA. These criteria, apart from a dictionary definition, must be satisfied to come under the MCIAA's smoking prohibition. Smoking is prohibited in a casino that is included within the operative statutory definition of "bar," §§ 50-40-103(1) and -103(5), MCA, and which in turn is included within the operative statutory definition of "enclosed public place." Section 50-40-103(3), MCA.

¶20 That is not to say that a dictionary definition of a place listed within § 50-40-103(3), MCA, cannot be useful in determining whether it is an "enclosed public

10

place." The Legislature provided the list of places to aid in understanding and applying its prohibition of smoking within enclosed public places, and not all places listed are separately statutorily defined, as the term "bar" is. However, a dictionary definition cannot contravene or render useless a statutory definition or the statutory structure itself.

¶21 The parties do not dispute that the casinos at issue here satisfy the statutory definition of "bar."[3] Therefore, we turn to the question of whether the attached smoking structures are enclosed public places by virtue of being "an indoor area [or] room . . . that the general public is allowed to enter or that serves as a place of work." Section 50-40-103(3), MCA. Our analysis addresses the alternative of serving "as a place of work."

¶22 For purposes of defining "enclosed public place," in which smoking is prohibited, the MCIAA further defines "place of work" as "an enclosed room where one or more individuals work." Section 50-40-103(7), MCA. Although the Casino Owners broadly argue that the structures are not a "place of work" based on the Board's discovery admission, they do not contest factually that "one or more individuals work" within the

---

[3] The Casino Owners offer a brief argument that the Board did not properly consider whether its bars are "establishment[s]" for purposes of the statutory definition of "bar," because "establishment" is further defined as "an enterprise *under one roof* that serves the public and for which a single person, agency, corporation, or legal entity is responsible." Section 50-40-103(4), MCA (emphasis added). The Casino Owners' position is that, because the shelters have a roof that is lower than the casinos' main roof, they are not "under one roof" and therefore are not part of the "establishment." However, the statute does not require that an establishment's roof be a solitary unit at a single height. The smoking structures are physically attached to the facility and roofed, thus satisfying that part of the definition of "establishment," but more importantly, they are part of the sole "enterprise . . . for which a single person, agency, corporation, or legal entity is responsible." Section 50-40-103(4), MCA.

11

structures. Thus, the specific issue here is whether the structures constitute an "enclosed room" for purposes of the definition of "place of work."

¶23 The Department of Public Health and Human Services has promulgated Admin. R. M. 37.113.101(2), which provides a definition of "enclosed room" for purposes of the statutory definition of "place of work" within § 50-40-103(7), MCA. The regulation defines "enclosed room" as "an area with a wall on all sides reaching from floor to ceiling, exclusive of windows and doors, and does not include an area completely or partially open to the outside air such as a roofed shelter."[4] The Casino Owners focus on the term "partially open to the outside air," and argue that the small vents on the exterior walls of the structures bring them within the exception to "enclosed room." The Casino Owners offer that this "falls within the range of reasonable interpretation. 'Open' and 'enclosed' are antonyms. It is reasonable to determine that two words with opposite meanings encompass different states of being."

¶24 The Board disputes the Casino Owners' argument but, given its admission in discovery that the structures are partially open to outside air as a factual matter, have also fallen back on the ironic position that the Department's regulation is inconsistent with the statute. Typically, it is the regulator that argues that a regulation is valid, while the "regulatee" argues the opposite. An administrative rule cannot "engraft an additional requirement onto the statute." *Giacomelli v. Scottsdale Ins. Co.*, 2009 MT 418, ¶ 24, 354 Mont. 15, 221 P.3d 666.

---

[4] The District Court mistakenly attributed this language to the statute, instead of the regulation.

¶25 Whether or not the regulation is consistent with the statute, we disagree that the Casino Owners' position "falls within the range of reasonable interpretation" of either one. The four walls of the structures, including a common wall with the casinos, inside entrances, a roof, with electricity, carpeting, heating and air conditioning, clearly demonstrate that these are "enclosed rooms," as stated in § 50-40-103(7), MCA, and are not "partially open to the outside air such as a roofed shelter," as stated in Admin. R. M. 37.113.101(2). The structures are much more than, and do not function solely as, a "roofed shelter." The small horizontal vents in the walls are the functional equivalent of "cracking a window" in a room to let in air, or of basement and attic venting of a house that does the same. Such venting does not turn the house or building into a partially open structure. We are convinced from a review of the statutory structure that the Legislature did not intend the statute to be applied in such a narrow and restrictive sense.

¶26 We conclude the Casino Owners' argument is without merit and the smoking structures are "places of work" within the meaning of the MCIAA. Given this conclusion, the structures are "enclosed public places" that are subject to the smoking prohibition of the MCIAA, and we need not consider whether the structures are open to the "general public."

***Judicial Admissions***

¶27 The Casino Owners argue the Board made a judicial admission in discovery that precludes the Board from contending on appeal that the smoking structures are a "place

13

of work."[5] The admission in question was made in response to the Casino Owners' Request for Admission No. 3.

> Request for Admission No. 3: "Please admit that the smoking areas at Gold's Casino and/or Players Casino are partially open to the outside air."

> The Board's response: "Admit that they are partially open to the outside air, but not sufficiently for these areas to qualify as smoking shelters. In areas, they have permanently installed walls on all sides which extend from floor to ceiling. For future reference, the Defendant does not concede that smoking is legal or permissible in what Plaintiffs refer to as 'smoking areas' at these two casinos."

¶28 A judicial admission is an express waiver conceding the truth of an alleged fact. *Bilesky*, ¶ 12 (quotations omitted). A judicial admission "has a conclusive effect upon the party who makes it, and prevents that party from introducing further evidence to prove, disprove, or contradict the admitted fact." *In re Raymond W. George Trust*, 1999 MT 223, ¶ 36, 296 Mont. 56, 986 P.2d 427 (internal quotations omitted). In order for a statement to constitute a judicial admission, the statement must satisfy criteria, including, among other things, that the statement "be a statement of fact, and not a statement of opinion or law." *Bilesky*, ¶ 13. The definition of a term in a statute is a statement of law. *State v. Dasen*, 2007 MT 87, ¶ 68, 337 Mont. 74, 155 P.3d 1282 ("The interpretation of a statute is a question of law.").

---

[5] The Casino Owners also contend the Board made a separate judicial admission that precludes the Board from arguing that the smoking structures are open to the "general public." The admission was made in response to Request for Admission No. 6, which reads: "Please admit that if the Plaintiffs, by rule, policy, or procedure, limit access to the smoking areas at Gold's Casino and/or Players Casino to a group of individuals that is less than every member of the general public, then the general public would not be allowed to enter such smoking areas." As we do not address the question of whether the structures are open to the general public, we need not address the arguments made regarding this admission.

¶29     Request for Admission No. 3 is linked to the language of Admin. R. M. 37.113.101(2), which excludes from the statutory definition of "enclosed room" an area that is "partially open to the outside air . . . ." While we agree that the Board's admission to this Request can be characterized as factual, the Casino Owners attempt to bootstrap this admission into a concession by the Board that the smoking structures are not a place of work, and, therefore, not an enclosed public place. However, even though the Board admitted that the structures were partially open in a factual sense, that admission did not equate to the legal determination that the structures did not constitute an enclosed room or enclosed public place, as we have above determined to the contrary. Given our rejection of the Casino Owners' interpretation of the statute, the Board's factual admission is immaterial to the legal interpretation of the MCIAA.

¶30     We conclude the Board is not precluded from contending on appeal that the smoking structures are places of work. As stated above, the smoking structures are, as a matter of law, enclosed public places and subject to the MCIAA's prohibition on smoking.

*Equitable Estoppel*

¶31     The Casino Owners argue the Board should be equitably estopped from enforcing the MCIAA because of the representations made by the Board's employees that the smoking structures were in compliance with the MCIAA. Equitable estoppel is common law doctrine based on the principle that "a party cannot, through his intentional conduct, actions, language, or silence, induce another party to unknowingly and detrimentally alter

15

his position and then subsequently deny the just and legal consequences of his intentional acts." *Stanley L. & Carolyn M. Watkins Trust v. Lacosta*, 2004 MT 144, ¶ 29, 321 Mont. 432, 92 P.3d 620 (internal quotations omitted).

¶32    The following elements must be shown by a clear and convincing evidence to demonstrate equitable estoppel: (1) there must be conduct, acts, language or silence amounting to a representation or a concealment of a material fact; (2) the facts must be known to the party to be estopped at the time of that party's conduct, or at least the circumstances must be such that knowledge of the facts is necessarily imputed to that party; (3) the truth must be unknown to the other party at the time the representation was acted upon; (4) the representation must be made with the intent or expectation that it will be acted on by the other party; (5) the representation must be relied upon by the other party, leading that party to act upon it; and (6) the other party must in fact rely on the representation so as to change its position for the worse. *City of Whitefish v. Troy Town Pump*, 2001 MT 58, ¶ 15, 304 Mont. 346, 21 P.3d 1026.

¶33    The Casino Owners claim, with regard to the first element, that the Board's agents made representations of a material fact that the smoking structures were in compliance with the MCIAA. Because we conclude that the representations made by the Board's employees were misrepresentations of law and not fact, we address only the first element of equitable estoppel.

16

¶34    In *City of Whitefish*, we addressed an analogous situation. *City of Whitefish*, 2001 MT 58, 304 Mont. 346, 21 P.3d 1026. In that case, Town Pump decided to attach an awning to its facilities. However, the City of Whitefish had adopted strict ordinances for commercial signs. *City of Whitefish*, ¶ 6. The Whitefish City Manager reviewed and approved blueprints for the awning before it was installed, and the Whitefish Building Inspector issued a building permit; both the City Manager and Building Inspector mistakenly believed the awning did not fall under the definition of "sign" for purposes of the City's sign ordinance. After Town Pump installed the new awning, the Whitefish City Council concluded the awning constituted a "sign" within the meaning of the City ordinance and that the sign violated the ordinance because it was too big. *City of Whitefish*, ¶¶ 7-8. Town Pump argued the City should be estopped from enforcing the ordinance because of the representations made by the City's employees. This Court nonetheless affirmed the district court's decision that the doctrine of equitable estoppel did not apply because the representations made by the employees were misrepresentations of law, not fact. *City of Whitefish*, ¶ 19.

¶35    Our analysis in *City of Whitefish* is dispositive. As in *City of Whitefish*, here the Board's employees reviewed and approved blue prints, issued a building permit, inspected the smoking structures, and made representations to the Casino Owners that the structures were in compliance with the law. The Board's employees, like the City of Whitefish's employees, were also ultimately mistaken with regard to the application of the law. If there is any factual distinction between *City of Whitefish* and the case at hand,

17

it is that, unlike the Casino Owners, Town Pump actually received approval of the design prior to construction. Therefore, if anything, the Casino Owners have less of a claim in equity than did Town Pump. We conclude that, because any representations made by the Board were misrepresentations of law, the Casino Owners have failed to establish the first element of equitable estoppel and their claim fails.

¶36    *2. Did the District Court abuse its discretion by awarding attorney fees to the Casino Owners for the preliminary injunction proceeding?*

¶37    Pursuant to § 25-10-711, MCA, a court may award reasonable attorney fees against a government entity if: (1) the "*opposing party prevails* against the state, political subdivision, or agency; and (2) the "court finds that the claim or defense of the state, political subdivision, or agency that brought or defended the action was frivolous or *pursued in bad faith*." (emphasis added).

¶38    The Board contends the District Court abused its discretion by awarding attorney fees to the Casino Owners for costs associated with the preliminary injunction proceeding, despite the fact it did not appeal the denial of the preliminary injunction. The Board offers that "[b]ecause the District Court erred in granting summary judgment for [Casino Owners], having misconstrued the [MCIAA]," the Casino Owners cannot be considered "the prevailing party" for purposes of an award of attorney fees.

¶39    The Casino Owners respond by focusing on the District Court's finding of bad faith on the part of the Board under the second prong of § 25-10-711, MCA. The Casino Owners note the Board's "ever-changing legal position and interpretation of the [MCIAA], the fact that its agents and employees filed false complaints against Owners,

18

that it singled out Owners, and that it was motivated to seek the preliminary injunction by an improper purpose."

¶40 Even if the District Court correctly concluded that the Board initiated the request for a preliminary injunction in bad faith, the Casino Owners must also demonstrate, apart from the Board's motives, that they are the prevailing party in the litigation in order to recover attorney fees. The second prong of § 25-10-711, MCA, does not subsume the first.

¶41 The term "prevailing party" is "a legal term of art." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603, 121 S. Ct. 1835, 1839, 149 L. Ed. 2d 855, 862 (2001). As a general rule, the "prevailing party is the one who has an affirmative judgment rendered in his favor at the conclusion of the entire case." *Avanta Fed. Credit Union v. Shupak*, 2009 MT 458, ¶ 49, 354 Mont. 372, 223 P.3d 863 (citations omitted). Though we have approved an award of attorney fees to a party who did not obtain an affirmative judgment on the merits, the party nonetheless obtained the "'very relief it sought to procure through litigation.'" *Citizens for Balanced Use v. Mont. Fish*, 2014 MT 214, ¶ 15, 376 Mont. 202, 331 P.3d 844 (quoting *Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 44, 333 Mont. 331, 142 P.3d 864).

¶42 The Casino Owners sought to prevent the Board from prohibiting smoking in the smoking structures. The Casino Owners have neither obtained a final determination of the underlying controversy in their favor, nor a material alteration in the parties' legal relationship that provided them the relief they sought to procure through litigation. The

Casino Owners' initial success regarding the preliminary injunction was short-lived, and when the matter proceeded to a final determination, they were ultimately unsuccessful.

¶43 Although the Casino Owners did succeed in the preliminary injunction proceeding, we explained in *Dreyer v. Bd. of Trs.*, 193 Mont. 95, 630 P.2d 226 (1981), that success at the preliminary injunction stage is not necessarily dispositive in determining the prevailing party. In *Dreyer*, members of the Mid-Rivers Telephone Co-op sought an injunction against the Board of Trustees of the Co-op to prevent them from holding a special meeting and election. The district court issued the injunction prohibiting the Board of Trustees from proceeding and the Board did not appeal the decision. *Dreyer*, 193 Mont. at 96, 630 P.2d at 227. The plaintiff members sought an award of attorney fees, which the court granted. *Dreyer*, 193 Mont. at 96-97, 630 P.2d at 227. This Court reversed and determined the court erred by awarding attorney fees to the plaintiff members based upon the injunction proceeding. We reasoned that "to equate the 'likelihood of success' that justifies a preliminary injunction with 'success' in the underlying litigation ignores significant procedural differences between preliminary and permanent injunctions." *Dreyer*, 193 Mont. at 101, 630 P.2d at 229. We concluded that the "plaintiffs have not yet prevailed in the action" and remanded the case to the district court to "determine the ultimate rights of the parties," prior to taking up the question of attorney fees. *Dreyer*, 193 Mont. at 100-101, 630 P.2d at 229. As noted above, cases since *Dreyer* have demonstrated that obtaining an injunction may be sufficient to support an award of attorney fees if it constitutes the very relief sought in the litigation.

20

¶44 Here, while the Casino Owners prevailed on the preliminary injunction, the ultimate rights of the parties have now been determined and the Casino Owners have failed on the merits. The Casino Owners are not the prevailing party under § 25-10-711, MCA, and do not qualify for an award of attorney fees.

¶45 Our law is consistent with that applied by the federal courts, which have held that, in the absence of a final judgment in the case, such as when a settlement is reached or the case is rendered moot, "there may be circumstances in which a preliminary injunction results in sufficiently enduring change to warrant an award of fees[.]" *Higher Taste, Inc. v. City of Tacoma*, 717 F.3d 712, 717 (9th Cir. 2013). Those circumstances do not exist when a party "succeeds at the preliminary injunction stage but loses on the merits after the case is litigated to final judgment" because in that instance the party "secures only an 'ephemeral' victory and gains no 'enduring' change in the legal relationship of the parties." *Higher Taste*, 717 F.3d at 717 (citing *Sole v. Wyner*, 551 U.S. 74, 86, 127 S. Ct. 2188, 2196, 167 L. Ed. 2d 1069, 1079 (2007)). As the United States Supreme Court concluded in *Sole v. Wyner*, a party "who secures a preliminary injunction, then loses on the merits as the case plays out and judgment is entered against her, has won a battle but lost the war." *Sole v. Wyner*, 551 U.S. at 86, 127 S. Ct. at 2196, 167 L. Ed. 2d at 1079 (quotations and brackets omitted). Accordingly, the award of attorney fees must be reversed.

21

¶46    We reverse the District Court's grant of summary judgment and award of attorney fees.  We remand for entry of summary judgment in favor of the Cascade City-County Board of Health.


/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT