**Opinion issued May 16, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00886-CV

————————————

## CADENCE BANK, Appellant

## V.

## ROY J. ELIZONDO III AND ROY J. ELIZONDO III PLLC, Appellees

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2014-65226

## O P I N I O N

In this appeal from a take-nothing judgment, the principal issue is who is liable for funds that were wire transferred from an attorney's IOLTA account to a third-party account overseas: the attorney or the bank? Attorney Roy J. Elizondo III and his firm, Roy J. Elizondo III, PLLC (collectively, "Elizondo") unwittingly

deposited a counterfeit check into Elizondo's IOLTA account with Cadence Bank, N.A., and Cadence credited the account with provisional settlement funds. Elizondo then requested that Cadence wire transfer funds from his IOLTA account to a third-party account overseas, and the parties executed a wire transfer agreement under which Cadence agreed to transfer the funds from a "verified collected balance." Cadence wire transferred the funds from Elizondo's account, but it did not verify whether the funds came from a collected balance. The drawee bank then dishonored the counterfeit check, and Cadence charged back Elizondo's account, resulting in an overdraft.

Cadence sued Elizondo to recover the overdrawn funds, asserting claims for breach of the parties' underlying deposit agreement and breach of warranty under the Texas Uniform Commercial Code. *See* TEX. BUS. & COM. CODE § 4.207. The parties filed cross-dispositive motions, and the trial court entered judgment for Elizondo. We hold that, by depositing the counterfeit check, Elizondo breached the parties' deposit agreement and UCC transfer warranties, thereby entitling Cadence to charge back the provisional settlement funds. *See id.* § 4.214(a). However, we further hold that, by failing to transfer the funds from a "verified collected balance," Cadence subsequently breached the parties' wire transfer agreement, thereby causing the overdraft and entitling Elizondo to offset the chargeback by the amount of overdrawn funds. Therefore, we affirm.

2

## Background

The material facts are largely undisputed. Elizondo is a plaintiffs' lawyer who works in Houston. He has an IOLTA deposit account with Cadence Bank.[1] The account is governed by a Deposit Account Agreement.

In September 2014, Elizondo fell victim to a sophisticated check-fraud scam. A putative international client solicited Elizondo via email for representation in a run-of-the-mill collection action. Elizondo agreed to represent the client, and, almost immediately thereafter, the client informed Elizondo that the putative debtor had agreed to settle. The client further informed Elizondo that the debtor would mail him (Elizondo) a cashier's check in the amount of the settlement. The client instructed Elizondo to deposit the check into his IOLTA account and to wire a portion of the funds to a third-party account in Japan. The client emphasized that time was of the essence, explaining that the dispute with the debtor had disrupted its cash-flow and caused it to fall into arrears with various entities with which it did business, including the holder of the Japanese bank account.

---

[1]   For the lay reader, IOLTA stands for "Interest on Lawyer Trust Accounts." IOLTA programs raise funds to provide legal services to indigent persons by pooling interest from lawyer trust accounts. *What is IOLTA?*, IOLTA.ORG: LEADERSHIP FOR EQUAL JUSTICE (Mar. 19, 2019), https://www.iolta.org/what-is-iolta.

On Friday, September 19, 2014, a cashier's check was delivered to Elizondo's office, just as the putative client said it would. The check was payable to Elizondo in the amount of $496,850 and drawn on JPMorgan Chase Bank, N.A.

The following Monday, September 22, Elizondo deposited the check into his Cadence bank account. That same day, Cadence provisionally credited Elizondo's account for the amount of the check.

On Tuesday, September 23, Elizondo contacted Cadence employee S. Yang-Oh and informed her that he needed to wire transfer a portion of the funds in his account to a third-party account in Japan. He sent Oh an email with the pertinent information, including the name of the receiving bank, the name of the beneficiary, and the amount to be wired ($398,980). Oh responded that she would "prepare [a] wire form and send it to [Elizondo] for a signature."

Later that day, Oh emailed Elizondo a wire transfer request form. The top half of the form consisted of fields filled in with the information that Elizondo had provided Oh in his earlier email. It included a signature box for Elizondo and a declaration stating:

> I understand that the bank makes no guarantees concerning the delivery of international wires. I also understand that I will be responsible for tracer fees if a problem arises or if the funds are returned. I will accept the net proceeds. I have been made aware that this process may take up to 10 business days.

The bottom half of the form included a field that listed Cadence's fee for the wire transfer as $55. The rest of the bottom half consisted of blank fields to be filled in by Cadence after Elizondo had signed and submitted the form. As relevant here, these included a field for the amount of the "collected balance" from which the wire transfer would be made and a field for the name of the "employee who verified [the] collected balance." The form stated that these two fields "must be filled in" by Cadence. The bottom half of the form also included a signature box for the Cadence officer who approved the wire transfer. The form instructed the officer as follows:

> Before signing off, be sure you "know your customer" and have verified the collected balance and documented any exception approvals.

The form did not define "collected balance."

Elizondo signed and emailed the form back to Oh. Oh then filled out and signed the two "collected balance" fields, indicating that the transfer would be made from a "collected balance" of $497,643.89. Oh did not verify whether $497,643.89 had actually been deposited into Elizondo's account or whether payment had been received for the check Elizondo had deposited earlier that Monday. Another Cadence employee, S. Baker, wrote in the margins of the form that $497,643.89 was Elizondo's "available balance," a term defined by the

5

Deposit Agreement to mean the amount "available for immediate withdrawal." Assistant Branch Manager Y. Villatoro signed the form as the approving officer.

On Wednesday, September 24, Cadence wire transferred $398,980 to the Japanese bank account using the provisional settlement funds that Cadence had credited to Elizondo's account on Monday.

On Thursday, September 25, the cashier's check was dishonored by Chase and returned to Cadence unpaid. Cadence notified Elizondo that the check had been dishonored and charged back the amount that had been provisionally credited to his account, resulting in a negative balance of $398,980. Cadence demanded that Elizondo repay the overdrawn funds. Elizondo refused.

In November 2014, Cadence filed its original petition against Elizondo. Cadence asserted claims for breach of contract based on the parties' Deposit Agreement and breach of warranty under Section 2.07 of the Texas UCC. Cadence sought to recover the amount of the overdrawn funds ($398,980) plus fees and costs.

Elizondo filed an answer, asserting a general denial and various affirmative defenses, including the right to an offset. *See* TEX. R. CIV. P. 94. Elizondo also asserted a counterclaim for breach of contract based the wire transfer request form, arguing that Cadence had breached the parties' agreement by failing to transfer the funds from a "verified collected balance."

In February 2017, Cadence filed a motion for summary judgment. Cadence asserted that it was entitled to summary judgment on its breach-of-contract claim under three sections of the Deposit Agreement:

- Article E, Section 1, which provides that all items accepted for deposit are subject to later verification and final payment and that credit for an item accepted for deposit is provisional and may be revoked if the item is not finally paid for any reason;

- Article E, Section 2, which provides that items delivered to Cadence for deposit are received by Cadence as the agent of the account holder and at the account holder's risk; and

- Article E, Section 14, which provides that Cadence may charge back a deposited item drawn on another bank if the item is returned to Cadence for any reason.

Cadence argued that, because the counterfeit cashier's check was returned unpaid, the Deposit Agreement entitled Cadence to reverse the provisional credit to Elizondo's account and recover the overdrawn funds from Elizondo.

Cadence also asserted that it was entitled to summary judgment on its claim for breach of warranty under Section 2.07 of the Texas UCC. Specifically, Cadence asserted that, by depositing the counterfeit check, Elizondo breached his warranties that "all signatures" on the check were "authentic and authorized" and that "the person on whose account the item is drawn authorized the issuance of the item in the amount for which the item is drawn." TEX. BUS. & COM. CODE § 4.207(a)(2), (6). Cadence further asserted that, as a result of Elizondo's breaches, it was entitled to charge back the provisional credit and recover as

7

damages the amount of the overdraft. *See id.* §§ 4.207(c) (permitting warrantee to recover as damages "an amount equal to the loss suffered as a result of the breach"), 4.214 (permitting bank to charge back provisional settlement funds for deposited check that is later dishonored by drawee).

Elizondo filed a response to Cadence's motion for summary judgment. He also filed his own motion for summary judgment on his breach-of-contract claim. Elizondo asserted that the wire transfer request form was a valid, enforceable contract that required the funds to be transferred from a "verified collected balance." Elizondo argued that Cadence breached the contract by transferring the funds from a balance that consisted of provisional settlement funds from an unpaid check. Elizondo further argued that Cadence's breach caused the overdraft and therefore entitled him to offset Cadence's right to a chargeback by the amount of the improperly transferred funds, resulting in zero damages to Cadence. Elizondo supported his argument with the deposition testimony of his expert witness, Kenneth Lehrer, who testified that a "collected balance" is an industry term that refers to a "depositor's balance minus deposited check in the process of collection, i.e., minus checks that have not been actually paid by the paying bank."

Cadence filed a response to Elizondo's motion for summary judgment. Cadence asserted that the wire transfer request form did not constitute a valid, enforceable contract and that the only valid contract between the parties was the

8

Deposit Agreement. Cadence further asserted that Elizondo misconstrued the meaning of "collected balance," which, according to Cadence, does not necessarily consist of funds that have actually been received and can include provisional funds from unpaid checks. Cadence supported its construction of "collected balance" with the deposition testimony of its corporate representative and branch administration manager, J. Scott, who testified that Cadence has its own, internal definition of "collected balance." And under this internal definition, Scott testified, a "collected balance" is "the end-of-day ledger balance less any debits plus any credits from the previous day." Scott further testified that the term "collected funds" does not necessarily include funds from checks that have been paid but rather simply refers to funds that are available for use.

Cadence further argued that, even if Elizondo had correctly construed "collected balance," Elizondo still bore the risk of loss for the transferred funds because funds deposited into a bank account can be challenged for up to three years after deposit. According to Cadence, "even if the check had been initially paid by [Chase], nothing could have prevented [Chase] from bringing claims against Cadence or Elizondo for up to three years in the future as a result of [Elizondo's] decision to negotiate and deposit a fraudulent and/or counterfeit check." Finally, Cadence argued that Elizondo's defensive theory would lead to absurd results: "if followed, [Elizondo's] creative contractual interpretation theory

9

would mean that for every single wire transfer Cadence Bank made, it would no longer seek to recover the money back from its own customer."

The trial court held a hearing on Cadence's and Elizondo's motions for summary judgment. After the hearing, the trial court denied Cadence's motion, granted Elizondo's motion, and rendered a take-nothing judgment. Cadence appeals.

**Cross-Motions for Summary Judgment**

In two issues, Cadence contends that the trial court erred in denying its motion for summary judgment and in granting Elizondo's motion for summary judgment. According to Cadence, this case is governed by Chapter 4 of the UCC and the parties' Deposit Agreement. Cadence contends that it proved as a matter of law that Elizondo is liable for breach of UCC transfer warranties and that Cadence is entitled to reverse the provisional settlement funds credited to Elizondo's account and to recover as damages the amount of the resulting overdraft under both the UCC and the Deposit Agreement. Cadence further contends that Elizondo's defenses are preempted by the UCC or otherwise fail to raise a genuine issue of material fact and that Elizondo failed to prove as a matter of law each element of his claim for breach of contract.

Elizondo responds that the case is governed by the wire transfer request form, which, according to Elizondo, constitutes a valid, enforceable contract that is

supported, not preempted, by the UCC. Elizondo contends that the contract required Cadence to wire transfer the funds from a "verified collected balance" and that Cadence breached the contract by transferring the funds using provisional credit for an uncollected check. Elizondo further contends that Cadence's breach caused the overdraft to his account and therefore entitles him to offset Cadence's chargeback by the amount of the overdrawn funds. Because the offset negates Cadence's damages, Elizondo concludes, the trial court properly entered a take-nothing judgment in his favor.

## A.      Standard of review

We review an order granting or denying a motion for summary judgment de novo. *Charles R. Tips Family Tr. v. PB Commercial LLC*, 459 S.W.3d 147, 152 (Tex. App.—Houston [1st Dist.] 2015, no pet.). When, as here, both parties moved for summary judgment and the trial court granted one and denied the other, we review the summary judgment evidence presented by each party, determine all questions presented, and render judgment as the trial court should have rendered. *Id.* We may affirm the judgment that the trial court rendered or reverse and render the judgment that the trial court should have rendered. *Id.*

11

## B. Applicable law

### 1. The UCC governs banking relationships and preempts inconsistent law

Under Texas law, the UCC regulates a bank's relationship with its Texas customers. *See generally* TEX. BUS. & COM. CODE §§ 3.101–.605 (negotiable instruments); *id.* §§ 4.101–.504 (bank deposits and collections); *id.* §§ 4A.101–.507 (funds transfers). "The relationship may also be governed in part by agreements between the bank and its customer, such as an agreement governing the processing of negotiable instruments presented to the bank." *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 133 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

"The UCC contains a comprehensive and carefully considered allocation of responsibility among parties to banking relationships." *Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 107 (Tex. 2004). It "must be liberally construed and applied to promote its underlying purposes and policies." TEX. BUS. & COM. CODE § 1.103(a). Those purposes and polices are "(1) to simplify, clarify and modernize the law governing commercial transactions; (2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and (3) to make uniform the law among the various jurisdictions." *Id.*

"To the extent they do not conflict with the Uniform Commercial Code's provisions, common law principles complement the Uniform Commercial Code."

*Contractors Source*, 462 S.W.3d at 138 (quoting *Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 624 (Tex. App.–Dallas 2005, no pet.)); *see also* TEX. BUS. & COM. CODE § 1.103(b) ("Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions.").

"Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise." TEX. BUS. & COM. CODE § 1.103 cmt 2.[2] Unless a specific provision of the UCC provides otherwise, the UCC "preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies." *Id.* The UCC's preemptive effect "extends to displacement of other law that is inconsistent with the purposes and policies of the Uniform Commercial Code, as well as with its text." *Id.*

### 2. Chapter 4 of the UCC governs deposits and collections

Chapter 4 of the UCC establishes the rights and duties between banks and their customers regarding deposits and collections. *See id.* §§ 4.101–.504; *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000).

---

[2] "The UCC official commentary is an authoritative interpretation of the Code." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 960 n.5 (5th Cir. 2012). "Barring a contrary interpretation from the Texas courts, we are guided by the official commentary." *Id.*

13

Chapter 4 imposes certain warranty obligations on customers who deposit checks drawn on other banks, establishes the circumstances under which settlements for such checks are provisional, and gives banks the right to charge back such settlements in the event that the check is dishonored by the drawee.

Section 4.207 imposes the warranty obligations. Under Section 4.207, when a customer deposits a check into his bank account and receives a settlement or other consideration for the check, he makes certain warranties to the bank. TEX. BUS. & COM. CODE § 4.207(a). Those warranties include that the customer is "a person entitled to enforce the item" and that "all signatures on the item are authentic and authorized." *Id.* § 4.207(a)(1), (2). These warranties "cannot be disclaimed with respect to checks." *Id.* § 4.207(d). If the customer breaches these warranties, a bank that took the check "in good faith" may recover as damages "an amount equal to the loss suffered as a result of the breach, but not more than the amount of the item plus expenses and loss of interest incurred as a result of the breach." *Id.* § 4.207(c).

Section 4.201 establishes the provisional status of settlements. Under Section 4.201, when a bank collects on a check deposited by its customer, the bank acts as the customer's agent. *Id.* § 4.201(a). Unless a contrary intent clearly appears, any settlement given for the check is provisional until the settlement

14

becomes final. *Id.* Section 4.201 applies even if credit given for the check is subject to immediate withdrawal or is in fact withdrawn. *Id.*

Section 4.214 establishes a bank's right of chargeback. Under Section 4.214, if a customer deposits a check into his bank account and the bank credits the customer's account with provisional funds, the bank may charge back the account if the check is later dishonored by the drawee. *Id.* § 4.214(a).

Section 4.103 addresses the circumstances under which the provisions of Chapter 4 may be varied by agreement. It provides:

> The effect of the provisions of this chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure.

*Id.* § 4.103(a). The official comments explain that Section 4.103 "confers blanket power to vary all provisions of the Article by agreements of the ordinary kind." *Id.* § 4.103 cmt. 2. "The agreement may be direct, as between the owner and the depositary bank; or indirect, as in the case in which the owner authorizes a particular type of procedure and any bank in the collection chain acts pursuant to such authorization." *Id.*

## C.    Analysis

Cadence argues that the trial court erred in denying its motion for summary judgment because the evidence proves as a matter of law that Elizondo is liable for breach of warranty under the UCC and breach of the parties' Deposit Agreement.

15

Cadence contends that, by depositing a counterfeit check into his bank account, Elizondo breached his warranties under Section 4.207 that he was "entitled to enforce" the check and that "all signatures" on the check were "authentic and authorized." *Id.* § 4.207(a)(1), (2). And because Cadence took the check "in good faith," Cadence was entitled under Section 4.207(c) to recover as damages the amount of the overdraft plus expenses. *Id.* § 4.207(c) (warrantee who takes item in good faith may recover as damages amount equal to loss suffered from breach plus expenses).

Cadence contends that it was also entitled to charge back the provisional credit to Elizondo's account and to obtain a refund in the amount of the counterfeit check under Sections 4.201 and 4.214 of UCC and Article E, Sections 1, 2, and 14 of Deposit Agreement. *Id.* § 4.201(a) (establishing that Cadence received check as Elizondo's agent and that settlement for check was provisional); *id.* § 4.214(a) (establishing bank's right to charge back provisional settlement for dishonored check). Cadence further contends that Elizondo's common law defenses are preempted by the various applicable provisions of the UCC, which are supplemented by the Deposit Agreement but otherwise dispositive in this case and provide a clear allocation of responsibility. Thus, Cadence concludes, the trial court erred in denying its motion for summary judgment on its claims for breach of warranty and breach of contract.

16

Elizondo does not dispute that he breached the transfer warranties of Section 4.207. Nor does he dispute that the UCC and Deposit Agreement entitle Cadence to charge back provisional settlement funds credited to an account for a check that is deposited but later dishonored by the drawee. Elizondo disagrees, however, with Cadence's contention that his breaches caused Cadence's alleged damages. He likewise disagrees that Cadence was entitled to recover the overdraft resulting from the chargeback in this case. According to Elizondo, Cadence's alleged damages were caused by Cadence itself.

After he breached his Section 4.207 warranties by depositing the counterfeit check, Elizondo entered into a subsequent agreement with Cadence—an agreement to wire transfer funds from Elizondo's account to an international third-party account. And, as a material term of that agreement, Cadence had a duty to transfer the funds from a "verified collected balance"—i.e., from funds that had actually been collected and were not merely provisional. Cadence breached this duty by wire-transferring funds without verifying whether the funds came from a collected balance. Had Cadence complied with the agreement, Elizondo argues, it would have verified that Elizondo lacked sufficient funds to complete the wire transfer and would not have completed the wire transfer with provisional funds from a check that had not been paid. Then, once Chase dishonored the check, Cadence would have charged back the provisional credit, resulting in no loss to Cadence.

Thus, Elizondo concludes, Cadence's subsequent breach of the wire transfer agreement entitled him to offset the chargeback by the amount of the overdraft.

Cadence responds that Elizondo's defensive theory—i.e., Elizondo's theory that Cadence's failure to transfer the funds from a "verified collected balance" entitles Elizondo to an offset—is preempted by the UCC. Cadence further responds that the wire transfer request form is not a valid, enforceable contract and that, even if it is, it did not require Cadence to transfer funds from a "verified collected balance"—at least not as Elizondo construes the term.

**1.    The UCC does not preempt Elizondo's right to an offset based on Cadence's breach of the wire transfer agreement**

We begin by considering whether the UCC preempts Elizondo's affirmative defense of the right to an offset. *See Lone Starr Multi-Theatres, Ltd. v. Max Interests, Ltd.*, 365 S.W.3d 688, 704 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (right to offset is affirmative defense); *see also* TEX. R. CIV. P. 94. Elizondo argues that, although Cadence has the right to charge back his account, Cadence's right to recover the overdrawn funds is offset by Cadence's breach of the wire transfer agreement, which was the cause of the overdraft. Cadence responds that Elizondo's affirmative defense is preempted by the UCC because the UCC expressly permits Cadence to charge back Elizondo's account and thus recover the overdraft.

As discussed above, the common law supplements, but does not supplant, the UCC's provisions. TEX. BUS. & COM. CODE § 1.103 & cmt 2; *Contractors Source*, 462 S.W.3d at 138 (common law principles complement UCC). Unless a specific provision of the UCC provides otherwise, if a common law defense conflicts with the UCC's purpose or text, the UCC preempts that defense. TEX. BUS. & COM. CODE § 1.103 cmt 2.

Thus, for example, various courts have held that the UCC preempts common law defenses to a bank's right to charge back provisional settlement funds. These courts reason that, because the UCC establishes when the right may be exercised and when the right terminates, it displaces common law defenses to a bank exercising the right, including defenses based on the bank's alleged fraud or negligence. *See, e.g.*, *Am. Dream Team, Inc. v. Citizens State Bank*, 481 S.W.3d 725, 732 (Tex. App.—Tyler 2015, pet. denied) (holding that depositor's claim that chargeback breached deposit agreement was preempted by UCC); *Avanta Fed. Credit Union v. Shupak*, 223 P.3d 863, 871 (Mont. 2009) (holding that credit union's statutory charge back rights were not subject to equitable estoppel); *Valley Bank of Ronan v. Hughes*, 147 P.3d 185, 191 (Mont. 2006) (holding that customer's common law claims relating to bank's processing of check, including bank's exercising its chargeback rights, were preempted by UCC).

19

But the UCC does not necessarily preempt common law defenses to a bank's right to recover an overdraft caused by a statutory chargeback of provisional settlement funds. For example, if a customer spends provisional funds based on the bank's misrepresentation regarding the status of the check settlement process, and the bank then charges back those funds, thereby causing an overdraft, the customer may assert common law defenses to the bank's right to recover the overdraft based on the bank's misrepresentation. *See Shupak*, 223 P.3d at 871–73 (holding that bank was not estopped from exercising right of chargeback but was liable for negligent misrepresentation that funds from cashier's check were "secure" and could be drawn upon); *Hughes*, 147 P.3d at 192 (holding that, although bank had right to charge back provisional credit for counterfeit check, customer could "obtain a judgment to compensate him for the charge-back debt" when bank employees made misrepresentations regarding status of check); *see Holcomb v. Wells Fargo Bank, N.A.*, 66 Cal. Rptr. 3d 142, 148 (Cal. Ct. App. 2007) (holding that, even though California UCC furnished bank with "absolute right" to charge back check upon drawee's dishonor, it did not shield bank from "damages due to its branch manager's alleged negligent misrepresentations regarding the check's status").

Although the UCC specifies duties and responsibilities for a bank in the actual check processing procedure, it is silent about the bank's communications

20

with the customer about that procedure. *Am. Dream Team*, 481 S.W.3d at 736. Because such communications are not addressed with specificity by the UCC, common law principles apply under these circumstances. *Id.* (holding that trial court erred in granting summary judgment on bank's preemption defense asserted against depositor's fraud claim arising out of statements made by bank tellers during check settlement process); *see Hughes*, 147 P.3d at 193 ("[I]n certain circumstances, common law and equitable principles may supplement the UCC where the bank—though not violating its UCC-defined duty of ordinary care with respect to processing checks—breaches a duty to its depositor by misrepresenting the status of the check settlement process.").

As one court explains, preempting common law defenses to a bank's right to charge back a provisional settlement, while permitting certain common law defenses to a bank's right to recover a resulting overdraft, "preserves the UCC's carefully drawn balance between 'certainty and predictability in commercial transactions,' and the comparative fault principles taken from tort law." *Shupak*, 223 P.3d at 871 (quoting *Call v. Ellenville Nat'l Bank*, 774 N.Y.S.2d 76, 78 (N.Y. App. Div. 2004)). The distinction, moreover, "logically addresses the actual harm to the parties": "Rather than estopping the bank from charging back the entire provisional settlement, an arguably arbitrary measure of damages, the customer

may sue [to] recover the actual harm caused by the bank." *Shupak*, 223 P.3d at 871.

Here, Elizondo has not asserted a common law defense to Cadence's statutory right to chargeback the provisional settlement funds. Nor does his defense arise from the manner in which Cadence processed the check. Rather, it arises from Cadence's representation—memorialized as a material term of the wire transfer agreement—that it would transfer the funds from a "verified collected balance." Because the UCC does not address such representations with specificity, Elizondo's defense is analogous to common law defenses based on a bank's representations regarding the status of the check settlement process. Moreover, Elizondo's defense logically addresses the actual harm he alleged suffered. *See id.* We hold that the UCC does not preempt Elizondo's affirmative defense of the right to an offset based on Cadence's breach of the subsequent wire transfer agreement.

### 2. Elizondo and Cadence entered into a valid and enforceable wire transfer agreement.

We now turn to whether the parties entered into a valid, enforceable agreement to wire transfer funds from Elizondo's account to a third-party account overseas. "The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Savoy v.*

22

*Nat'l Collegiate Student Loan Tr. 2005-3*, 557 S.W.3d 825, 835 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Here, the undisputed evidence shows that Elizondo informed Oh that he needed to wire transfer funds from his Cadence account to a third-party account in Japan and provided Oh with the information necessary to complete the transfer.

Oh responded by preparing a wire transfer request form and emailing it to Elizondo for signature. The top half of the form consisted of fields filled in with the information that Elizondo had provided Oh. The top half also included a box for Elizondo's signature and a declaration that Elizondo understood that Cadence makes no guarantees concerning the delivery of international wires; that he would be responsible for tracer fees if a problem arose or if the funds were returned; and that the transfer could take up to 10 business days. The bottom half of the form included Cadence's fee for the wire transfer ($55) and blank fields to be filled in by Cadence employees after Elizondo had signed and submitted the form. These blanks included a field for the amount of the "collected balance" from which the wire transfer would be made and a field for the name of the "employee who verified [the] collected balance." The bottom half of the form stated that these two blank fields had to be filled in by a Cadence employee. The bottom half also included a signature box for the Cadence officer who approved the wire transfer and instructed the officer as follows:

Before signing off, be sure you "know your customer" and have verified the collected balance and documented any exception approvals.

Elizondo reviewed the form, signed it, and emailed it back to Oh. Oh then filled out and signed the two "collected balance" fields, writing that the "collected balance" was $497,643.89. Another Cadence employee, S. Baker, filled out several other fields and wrote in the margins of the form that $497,643.89 was Elizondo's "available balance." And Assistant Branch Manager Y. Villatoro signed the form as the approving officer. After these Cadence employees filled out the remainder of the form, Cadence wire transferred funds from Elizondo's account to the third-party account in Japan.

This evidence shows that the parties entered into a valid and enforceable agreement. By signing the form and returning it to Cadence, Elizondo made an offer—an offer to pay Cadence $55 to wire transfer "verified collected" funds from his IOLTA account to a third-party account in Japan. By accepting, completing, and signing the form, Cadence accepted Elizondo's offer. The parties' course of conduct likewise reflects a meeting of the minds, each party's consent to the terms, and execution and delivery of the contract with the intent that it be mutual and binding. We hold that the parties entered into a valid, enforceable agreement to wire transfer funds from Elizondo's account to a third-party account in Japan and that the terms of that agreement are set forth in the wire transfer request form.

24

### 3. The agreement required Cadence to transfer funds from a "verified collected balance."

Having determined that the parties entered into a valid, enforceable wire transfer agreement, we now consider whether that agreement required Cadence to transfer the funds from a "verified collected balance." Cadence argues that it was not required, as a material term of the agreement, to transfer the funds from a collected balance because the fields on the bottom half of the form, including the fields instructing Cadence to verify the collected balance, were not filled in when Elizondo signed and submitted the form. We disagree.

Not all the fields on the bottom half of the form were incomplete when Elizondo signed and submitted the form. Importantly, the field for Cadence's fee—which was on the same row as the collected balance fields—was completed and stated that the fee for the wire transfer would be $55. Because Cadence's fee was a material term of the agreement, the field's placement in the bottom half of the form next to the collected balance fields indicates that the collected balanced fields constitute material terms as well. Moreover, the form did not state that the bottom half was for Cadence's use only or otherwise indicate that the bottom half did not constitute part of the agreement. And form contracts are routinely executed in this manner—with one party signing and submitting a document with various fields left incomplete and to be filled by the other party. When Elizondo submitted the form, he knew the bottom would be completed by Cadence, as the form expressly states

that the bottom half fields "must be filled in." We therefore reject Cadence's argument that the collected balance fields do not form part of the agreement by virtue of their location on the bottom half of the form and the time at which they were completed.

Cadence further argues that, even if the agreement required Cadence to transfer the funds from a "collected balance," that term does not bear the meaning that Elizondo ascribes to it. Thus, we must construe the term "collected balance."

We construe contract terms according to their plain, common, or generally accepted meanings unless the contract shows that the parties used words in a technical or different sense. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Here, both sides agree that the term "collected balance" is an industry term. To determine the meaning of an industry term, a court may refer to extrinsic evidence, such as industry dictionaries, statutory definitions, or expert testimony. *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 323 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). In this case, Elizondo and Cadence offer the deposition testimony of their respective witnesses to support their proposed alternative constructions of "collected balance."

Specifically, Elizondo offers the testimony of his expert witness, Dr. Kenneth Lehrer, a registered investor advisor who has served as chairman of four banks. In his deposition, Lehrer testified that a "collected balance" is an industry term that means a "balance minus deposited checks in the process of collection, i.e., minus checks that have not been actually paid by the paying bank." Lehrer explained that the definition of collected balance is "banking 101: Either you got the money or you don't."

Cadence offers the testimony of its corporate representative and branch administration manager, J. Scott. In her deposition, Scott testified that Cadence has its own, internal definition of "collected balance." And under that internal definition, Scott testified, "collected balance" means "the end-of-day ledger balance less any debits plus any credits from the previous day," not including credits subject to "holds." Thus, Scott explained, under Cadence's internal definition, a "collected balance" does not "necessarily" consist of funds that have "actually" been "received" and can include provisional credit for uncollected checks.

Cadence also offered the testimony of its expert witness, Richard McElroy, Jr. In his deposition, McElroy testified that every bank has its "own definition of collected balance" based on the bank's assumption of when funds for deposited items are collected. McElroy testified that a bank cannot determine on a case-by-

case basis when payment has been received for each deposited item and that a bank therefore determines a customer's collected balance based on the bank's assumption of when payment for each deposited item is most likely to be received. The bank's assumption, in turn, is based on the bank's own "internal calculations and formulas" and has "has no connection with reality"—i.e., no connection with when the funds are actually received.

Although neither party has offered any other extrinsic evidence, such as an industry dictionary or statutory definition, to support their proposed constructions of "collected balance," through our own research, we have found authority supporting both constructions.[3]

---

[3] *Compare In re Cannon*, 237 F.3d 716, 720 n.5 (6th Cir. 2001) ("The collected balance refers to the balance of collected debits and credits; the ledger balance is the balance of all debits and credits, both collected and uncollected. Thus, when a bank grants a provisional credit it shows up on the ledger balance, but not the collected balance."), *and* 12 C.F.R. §§ 707.1–.11, Appendix C to Part 707—Official Staff Interpretations, Bk. Compl. Gd. 6262671 ("Collected balance means the record of balance in a member's account reflecting collected funds, that is, cash or checks deposited in the credit union which have been presented for payment and for which payment has actually been received."), *with Frost Nat'l Bank v. Parker*, No. 95-2150, 1999 WL 33438078, at *2 (C.D. Ill. Feb. 26, 1999), *aff'd sub nom. Frost Nat. Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862 (7th Cir. 2001) ("The collected balance is the result of the computer's estimate of how long it will take to collect [deposited] items through the banking system, usually between one and five days."); *see also* FRB Adopts Truth in Savings Regulations, Fed. Bank. L. Rep. P 89134, 1992 WL 12914346 (Federal Reserve Board of Governors observing that "the term 'collected balance' does not have a uniform meaning within the financial services industry").

However, we are convinced that, under these circumstances, the construction proposed by Elizondo reflects the true intent of the parties as expressed in the instrument. *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 224 S.W.3d 369, 379 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("In construing a written contract, our primary concern is to ascertain the true intent of the parties as expressed in the instrument."). That is largely because Elizondo's proposed construction is the only one that harmonizes and gives effect to the provisions of both the wire transfer agreement and the underlying Deposit Agreement. *See id.* ("We examine the entire writing in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless.").

The Deposit Agreement does not define "collected balance." It does, however, define "available balance" and "posted balance":

> Available Balance—The balance of funds in [the customer's] account that is available for immediate withdrawal. Unlike the Posted Balance, the Available Balance reflects any holds placed on [the] account . . . .

> Posted Balance—The balance of funds in [the customer's] account based solely on items that have been posted as credits or debits to [the] account. Unlike the Available Balance, the Posted Balance does not reflect any holds placed on [the] account.

This indicates that the term "collected balance" must mean something different than these two defined terms. But as Elizondo points out repeatedly in his brief, Cadence uses "collected balance" and "available balance" interchangeably.

29

Cadence has not attempted to rebut this point. In fact, Cadence appears to agree. In its reply brief, Cadence states (with emphasis added by us):

> Collected balance in the computer system represents the end-of-day ledger balance, minus any debits, and plus any credits from the previous day. This collected balance can include a provisional credit for a check when holds have been removed regardless whether the check has been finally paid. *Even the version of the form that Elizondo relies on specifically states: "Ava. Bal: 497,643.80."*

Thus, were we to adopt Cadence's proposed construction, "collected balance" and "available balance" would mean the same thing: the customer's ledger balance, less any debits, plus any credit not subject to holds. But this would run afoul of various contextual canons, including the presumption of consistent usage, according to which a material variation in terms suggests a variation in meaning;[4] and the rule against surplusage, according to which a term should not be given an interpretation that causes it to duplicate another term or to have no consequence.[5]

Moreover, Cadence never disclosed its internal definition of "collected balance" to Elizondo. Indeed, in its brief, Cadence emphasizes that it construes "collected balance" according to an "internal definition" that is not disclosed to its

---

[4]    *See In re CVR Energy, Inc.*, 500 S.W.3d 67, 77 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Horseshoe Bay Resort, Ltd. v. CRVI CDP Portfolio, LLC*, 415 S.W.3d 370, 384 & n.7 (Tex. App.—Eastland 2013, no pet.).

[5]    *See Bishop v. Owens*, No. 01-13-00678-CV, 2014 WL 4260520, at *8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2014, no pet.) (mem. op.).

customers. But Cadence's failure to disclose its internal definition to Elizondo only underscores that Elizondo had no reason to construe the term according to that definition.

When a bank uses a form contract to facilitate a transaction with a customer, and the contract uses a term with various acceptable meanings within the industry, the bank cannot construe that term according to an internal, undisclosed definition that has the same meaning as another term defined in a separate document governing the relationship between the parties. Here, Cadence presented no evidence that its internal definition of "collected balance" was made available to Elizondo or that Elizondo would otherwise have reason to construe the term according to this definition. To the contrary, Cadence's expert affirmatively testified that Cadence had no duty and no reason to do so.

We reject Cadence's contention that the term should be construed according to Cadence's internal, undisclosed definition and instead construe the term according to the definition proposed by Elizondo. Thus, the term "collected balance," as used in the wire transfer request form, means the balance of funds that have actually been collected and therefore excludes funds for unpaid checks and other items in the process of collection.

31

**4.  Cadence caused the overdraft by breaching the agreement.**

Elizondo and Cadence entered into a valid, enforceable agreement to wire transfer funds from Elizondo's IOLTA account to a third-party account overseas. The agreement required Cadence to transfer the funds from a verified collected balance—i.e., from a balance consisting of funds from checks for which payment had actually been received from the paying banks. Cadence failed to do so—it made the transfer using the provisional settlement funds credited to Elizondo's account for the counterfeit check before payment for the check had actually been received from the paying bank. Thus, Cadence breached the parties' agreement.

Had Cadence not breached the agreement, the chargeback made by Cadence to Elizondo's account would not have resulted in an overdraft. Instead, Cadence would have verified that Elizondo lacked sufficient funds to complete the wire transfer and would not have completed the wire transfer with provisional settlement funds from the unpaid check. Then, once Chase dishonored the check, Cadence would have charged-back the provisional credit, resulting in no loss to Cadence.

Cadence nevertheless contends that Elizondo is not entitled to an offset. Cadence argues that it is irrelevant whether the funds were transferred from a "collected balance" because a drawee bank may dishonor a check for up to three years. So even if Chase had initially paid the check—and Cadence had thus

transferred funds from a collected balance—Chase would have eventually discovered that the check was counterfeit and revoked the payment, and Cadence would have then been entitled to chargeback Elizondo's account and recover the overdraft. We disagree.

First, case law across various jurisdictions, including Texas, consistently recognizes that a customer may assert a bank's subsequent misrepresentations regarding the status of the check settlement process as a defense to a bank's right to recover an overdraft caused by a chargeback. *See, e.g.*, *Am. Dream Team*, 481 S.W.3d at 736; *Shupak*, 223 P.3d at 873; *Holcomb*, 66 Cal. Rptr. 3d at 148.

Second, whether the funds were transferred from a "collected balance" *is* relevant. Even though a drawee bank may dishonor a check for up to three years, a customer of the collecting bank might reasonably insist that the check be paid before transferring funds from the check because the drawee's initial payment would at least indicate that the check—and the funds from it—were good. Thus, Elizondo could reasonably insist that funds be transferred from a collected balance—despite Chase's right to revoke the settlement for up to three years— because Chase's initial payment of the check would indicate (though not conclusively prove) that the check was good.

We hold that Cadence's breach of the wire transfer agreement entitled Elizondo to offset Cadence's chargeback by the amount of the overdrawn funds as a matter of law.

\* \* \*

In sum, Elizondo breached the UCC and the parties' Deposit Agreement by depositing the counterfeit check into his IOLTA bank account. Elizondo and Cadence then entered into a valid and enforceable agreement to wire transfer funds from Elizondo's account. The agreement required Cadence to wire transfer the funds from a "verified collected balance." Cadence breached the agreement by making the transfer using the provisional settlement funds credited to Elizondo's account for the unpaid, counterfeit check. Had Cadence not breached the agreement, the chargeback made by Cadence to Elizondo's account would not have resulted in an overdraft. Thus, although Cadence had the right under the UCC and the Deposit Agreement to charge back the provisional settlement funds, Elizondo was entitled to offset the chargeback by the amount of the overdrawn funds, thereby negating Cadence's alleged damages. We hold that the trial court did not err in granting Elizondo's motion for summary judgment. Accordingly, we overrule Cadence's two issues.

## Conclusion

We affirm the trial court's judgment.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Justice Keyes, dissenting.